**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **TRES TECH CORPORATION,** | § | |
| **Petitioner/Plaintiff,** | § | |
| | § | **CIVIL ACTION NO.** |
| **v.** | § | **3:13-cv-1800-K** |
| | § | |
| **CAREFUSION CORPORATION,** | § | |
| **Respondent/Defendant** | § | |

**APPENDIX IN SUPPORT OF TRES TECH'S MOTION TO**
**CONFIRM ARBITRATION AWARD AND REPLY IN SUPPORT THEREOF**

Tres Tech Corporation ("Tres Tech"), Petitioner/Plaintiff, files this Appendix in Support

of its Motion to Confirm Arbitration Award and Reply in Support of Motion to Confirm

Arbitration Award.

Respectfully submitted,

WINSTEAD PC

 */s/ Talmage Boston*
Talmage Boston
Texas Bar No. 02681800
tboston@winstead.com
Elisabeth A. Wilson
Texas Bar No. 24056896
ewilson@winstead.com
Jeffrey A. Tinker
Texas Bar No. 24060733
jtinker@winstead.com

500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
(214) 745-5400 (Telephone)
(214) 745-5390 (Fax)

**ATTORNEYS FOR TRES TECH**
**CORPORATION, PETITIONER/PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that on June 21, 2013, I electronically filed the foregoing document using the CM/ECF system, which will send notification of such filing via electronic mail to all counsel of record.

_/s/ Talmage Boston_
Talmage Boston

## INDEX

| Exhibit | Description | Page Nos. |
|---------|-------------|-----------|
| A | Final Judgment | APP 001 – 030 |
| B | 1995 Royalty Agreement | APP 031 – 046 |
| C | Award – 4/13/13 | APP 047 – 073 |
| D | CareFusion check in the amount of $597,244.00 | APP 074 – 080 |
| E | Demand for Arbitration – 7/31/12 | APP 081 – 089 |
|   | Ex. A – Royalty Agreement | APP 090 – 104 |
|   | Ex. B. – Patent and Technology Transfer, Manufacturing and Marketing Agreement | APP 105 – 136 |
|   | Ex. C – 5/18/95 letter from SensorMedics Critical Care to Carl Strating | APP 137 – 140 |
| F | Notice appointing arbitrator James J. Kozuch, Esq. | APP 141 – 159 |
| G | Notice appointing arbitrator Peter L. Michaelson, Esq. | APP 160 – 175 |
| H | Notice appointing arbitrator Daniel Ebenstein, Esq. | APP 176 – 189 |
| I | Declaration of Talmage Boston in Support of Reply | APP 190 – 194 |
|   | Exs. A – G – Email between counsel | APP 195 – 204 |
|   | Ex. H – Amended Certificate of Conference | APP 205 – 206 |
|   | Ex. I – CareFusion 202's Trial Brief excerpt | APP 207 – 210 |
|   | Ex. J-CareFusion Corporation's Response to Demand for Arb. | APP 211 – 212 |

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

TRES TECH CORPORATION,                §
    Petitioner/Plaintiff,             §
                                      §
                                      §   CIVIL ACTION NO. _____
v.                                    §
                                      §
                                      §
CAREFUSION CORPORATION,               §
    Respondent/Defendant              §

## FINAL JUDGMENT

On the 13th day of May, 2013, Tres Tech Corporation, Petitioner/Plaintiff in this case, filed a Motion to Confirm Arbitration Award ("the Award") for the Award against CareFusion Corporation, Respondent/Defendant, dated April 13, 2013 made by a Panel of three arbitrators, in proceedings conducted by the American Arbitration Association ("the Award"), pursuant to an arbitration provision contained in that certain Royalty Agreement dated July 1, 1995, which governs the dealings between these parties ("the Royalty Agreement"). A true and correct copy of the Award is attached to this Judgment as Exhibit A.

The Court, having considered the Motion, and having reviewed all documents attached to the Motion, and being aware that CareFusion has not complied with the Award as of the date when the Motion was filed, is of the opinion that Tres Tech Corporation, Petitioner/Plaintiff, is entitled to Final Judgment against CareFusion Corporation, Respondent/Defendant, confirming the Arbitration Award attached hereto as Exhibit A.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED by the Court that Tres Tech, Petitioner/Plaintiff, shall have Final Judgment as follows:

1.    IT IS ORDERED that the Award attached hereto as Exhibit A is hereby confirmed in every respect, and is incorporated by reference herein as part of this Final Judgment.

APP.002

2.    IT IS FURTHER ORDERED, consistent with the Award, that Tres Tech is entitled to its requested declaratory relief of the Royalty Agreement, such that this Court declares that the Royalty Agreement shall remain in effect through March 17, 2018.

3.    IT IS FURTHER ORDERED, consistent with the Award, that Tres Tech is entitled to recover damages from CareFusion, in the amount of $597,224.00 for those royalties owed, which became due and payable by CareFusion to Tres Tech as of March 31, 2012.

4.    IT IS FURTHER ORDERED, consistent with the Award, that Tres Tech is entitled to recover damages from CareFusion for the unpaid royalties owed under the Royalty Agreement for the time period between April 1, 2012 and the date of this Final Judgment.

5.    IT IS FURTHER ORDERED, consistent with the Award, that the Royalty Agreement shall be binding and enforceable through March 17, 2018 because Tres Tech has not engaged in patent misuse.

6.    IT IS FURTHER ORDERED that from the time such royalties become due and payable, this Final Judgment shall bear pre-judgment interest at the rate of 10% per annum from March 31, 2012, on all amounts of royalty owed by CareFusion to Tres Tech through the date of this Final Judgment, in accordance with California law.

7.    IT IS FURTHER ORDERED that this Final Judgment shall bear post-judgment interest at the rate of 10% per annum from date of Judgment until date of payment, in accordance with California law.

8.    IT IS FINALLY ORDERED that all costs of Court expended or incurred in this cause by Tres Tech are adjudged against CareFusion; and all writs and processes for the enforcement and collection of this Final Judgment or the costs of court may issue as necessary. All other relief not expressly granted in this Final Judgment is denied.

SIGNED on this _____ day of _____, 2013.

_____

JUDGE PRESIDING

APR-12-2013  16:05        AMSTER ROTHSTEIN EBENSTIE        1 212 336 8001    P.002

# AMERICAN ARBITRATION ASSOCIATION
## Commercial Arbitration Tribunal

| |
|---|
| TRES TECH CORPORATION, |
| Claimant and Counter-respondent, |
| v. |
| CAREFUSION CORPORATION, |
| Respondent and Counter-claimant. |

Case No.: AAA 76 122 Y 00149 12 JENF

## AWARD OF ARBITRATOR

WE, THE UNDERSIGNED PANEL, having been designated in accordance with the arbitration agreement entered into between the above-named parties and dated July 1, 1995, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, do hereby, AWARD, as follows:

1.  The unanimous Panel finds that enforcement of the 1995 Royalty Agreement after 2006 is not patent misuse; and

2.  A majority of the Panel finds that the 1995 Royalty Agreement expires March 17, 2018.

This arbitration was hard fought by counsel with skill and thoroughness. The Panel authorized significant discovery, received Pre-Hearing briefs on February 1, 2013, conducted a three-day evidentiary hearing on February 18, 19 and 20, 2013 and held several hours of closing argument in this case on February 20, 2013. The Panel then received Post-Hearing Briefs on March 8, 2013 and Post-Hearing Reply Briefs on March 15, 2013. This created a full and

1



EXHIBIT

A

to Final Judgment

APP.005

detailed record from which the Panel has had a full opportunity to consider the issues raised and evidence presented in this proceeding.

During the Hearing, Tres Tech withdrew its allegation that the version of the 1995 Royalty Agreement marked as Joint Exhibit 1 was a forgery, and CareFusion stipulated that the 1995 Royalty Agreement at issue is the Joint Exhibit 2 version. This eliminated from the arbitration the issue of which version of the 1995 Royalty Agreement was the effective agreement. The Panel's decisions are based on the Joint Exhibit 2 1995 Royalty Agreement.

The following sets forth the Panel's reasons for the decisions stated above:

### Patent Misuse

CareFusion contends that the 1995 Royalty Agreement is unenforceable after April 18, 2006 when the last of the original patents in which Jensen was an inventor or a co-inventor ("the Jensen Patents") expired on the grounds that enforcement of the 1995 Royalty Agreement after that date would constitute patent misuse as a per se antitrust violation under the holding in Brulotte v. Thys Co., 379 U.S. 29 (1964) and subsequent cases, including Zila, Inc. v. Tinnell, 502 F.3d 1014 (9th Cir. 2007).

For the reasons discussed below, the Panel finds that under Brulotte and the related cases, enforcement of the 1995 Royalty Agreement after 2006 does not constitute patent misuse.

The gravamen of the cases under Brulotte is that a patent owner may not use the power of its patent monopoly to require a licensee to pay royalties or face patent restrictions after expiration of the licensed patents, and that any such requirement is unenforceable as a matter of patent misuse. In Brulotte, the Court concluded that, in view of the nature of the license agreement there, including post expiration use royalties and post expiration restrictions on transfer, "the Licensee was using the licenses to project its monopoly beyond the patent period."

2

(379 U.S. at 32).  The Court said "We are, therefore, unable to conjecture what the bargaining position of the parties might have been and what resultant arrangement might have emerged had the provision for post-expiration royalties been divorced from the patent and nowise subject to its leverage."  In short, Brulotte held that to use a patent's leverage to project royalty payments beyond the patent's life is improper.

While the Brulotte doctrine has been criticized (see, Scheiber v. Dolby Laboratories, Inc., 293 F.3d 1014 (7th Cir. 2002 )) and refined in a series of cases which recognize the tension between the parties' right to contract and antitrust policy, it remains good law for the basic principle, subject to caveats.  See, e.g.,  Aronson v. Quick Point Pencil Co., 440 U.S. 257 (1979) (where the pending patent application at the time of the deal never matured into a patent there could be no patent leverage and there was no misuse).

A brief summary of the series of agreements which brought the parties to where they were in 1995 when the 1995 Royalty Agreement was executed is appropriate for consideration of this issue.

In 1984, Texas Research, Inc. ("TRI"), which had developed the basic high-frequency ventilator technology, entered into a Patent and Technology Transfer, Manufacturing and Marketing Agreement with Gould Inc. That agreement provided for the transfer to Gould of proprietary technical information, drawings, data and the like as well as certain pending patent applications, which later matured into the Jensen Patents.  The 1984 Agreement was not a patent license per se, but a business agreement that provided TRI with the right to manufacture certain components of high-frequency ventilators for Gould, contained a non-compete provision by TRI, provided for consulting services by TRI and governed other business relations between the parties. It incorporated a specific agreed definition of "high-frequency ventilator" or "HFV" (see

3

paragraph 1. 3); defined the "HFV Technology" transferred to Gould which included technical know-how, trade secrets drawings and the like "whether or not patentable" (See paragraph 1.7); provided for certain upfront payments; and provided for a royalty based on the sales and rentals of HFV Equipment.  The agreement provided that if the Equipment subject to royalty was not covered by one or more "Patent Claims" (a defined term not limited to the Jensen Patents) the applicable royalty would be cut in half.

Most importantly here, the agreement provided for the assignment to Gould and its successors of the entire right, title and interest in and to the HFV Patents, which involved the transfer to Gould of all of the then pending patent applications which would later mature into the Jensen Patents.  The agreement was to continue until the expiration of those patents, or 21 years from the effective date, whichever was later.

There are other provisions in the 1984 Agreement which are not material to the issue of patent misuse, but are discussed later in connection with interpretation of the terms of the 1995 Royalty Agreement.

In 1987, Tres Tech acquired the assets of TRI, including the grantor side of the 1984 Agreement, and Sensormedics ultimately acquired the grantee side of the 1984 Agreement from Gould.  The details of related bankruptcies and the sequence of acquisitions is not material to the issue now under discussion.

In 1989, Tres Tech (as successor to the TRI interest) and Sensormedics (ultimately "SMCCC") as successor to the Gould interest entered into a new Royalty Agreement which replaced the 1984 Agreement and provided for a royalty obligation for 21 years from the date of the 1989 Royalty Agreement.  In effect, as relevant here, under the 1989 Royalty Agreement, SMCCC retained the Jensen Patents and the full rights to use the Jensen Patents until their

4

expiration. There are some confusing aspects to the 1989 Royalty Agreement, but neither party has challenged SMCCC's right to the Jensen Patents nor asserted any legal impropriety in the terms of the 1989 Royalty Agreement.

It is against this background that from May to November, 1995 Tres Tech and SMCCC negotiated what became the 1995 Royalty Agreement. The details of such negotiations were a substantial subject of the Hearing. Both the Tres Tech negotiator, Mr. Strating, and the SMCCC negotiator, Mr. Ross, testified extensively at the Hearing. What is clear from this testimony is that renegotiation of the 1989 Royalty Agreement was initiated by Mr. Ross on behalf of SMCCC for the purpose of altering the royalty structure under the 1989 Royalty Agreement and reducing SMCCC's royalty obligation going forward. Both negotiators agree that it was their intention to extend the period of the royalty obligation in consideration for a modification of the royalty structure and reduction of the royalty rate, which Mr. Ross felt would be highly advantageous to SMCCC.

In view of this history and background, and the positions of the parties at the time of the 1995 Royalty Agreement, CareFusion's arguments concerning the applicability of Brulotte and the related cases improperly rely on the simple assertion of what has been called "bright line" rules in some of the cases. CareFusion argues that the current case is substantially on all fours with the Zila case in the Ninth Circuit. Thus, CareFusion argues that since royalties in the 1995 Royalty Agreement extend beyond the expiration date of all of the Jensen Patents, and since the 1995 Royalty Agreement does not provide that the royalties will be reduced in 2006 at the time when the last of the Jensen Patents expired, the agreement constitutes a patent misuse.

The Panel does not agree.

5

APR-12-2013  16:07          AMSTER ROTHSTEIN EBENSTIE              1 212 336 8001       P.007

First, unlike Brulotte and its progeny, the record establishes that in entering into the 1995 Royalty Agreement, Tres Tech did not, and indeed could not, have used leverage of the Jensen Patents to extract extended royalty payments from CareFusion after the expiration of those patents.  SMCCC already had the right to all of the Jensen Patents when it sought the revised royalty arrangement.  There is no dispute that SMCCC and its successors owned and could continue to use the Jensen Patents under the 1989 Royalty Agreement for the life of those patents.  By entering into the 1995 Royalty Agreement, SMCCC sought no new or additional rights to the Jensen Patents, and a desire to obtain rights in the Jensen Patents could have played no part in SMCCC's agreement to alter the royalty form and term.

Rather, the record establishes that the replacement of the 1989 Royalty Agreement with the 1995 Royalty Agreement was at SMCCC's urging for the purpose of reducing its royalty.  Under the Scheiber case, if this was simply a new patent license the question of who suggested extending the royalty period might arguably not be relevant.  However, in the current circumstance, the existing situation of the parties at the time of the 1995 Royalty Agreement and the way in which the 1995 Royalty Agreement came about establishes that any modification of the basis for and extension of the term of royalties was not based on the Jensen Patents or any patent rights of Tres Tech.  Rather, this was an agreed contractual bargain, and nothing more.  The mere existence of the Jensen Patents, then in SMCCC's hands and under its control, does not automatically convert this contractual bargain into a patent misuse.

Perhaps recognizing this, CareFusion's Post-Hearing Brief argues that the 1995 Royalty Agreement resulted from the leverage of the Jensen Patents, quoting Hearing Tr. at 389:25-390:15 (see CareFusion's Post-Hearing Brief at p. 10).  However, this portion of the record in no

6

way substantiates CareFusion's contention concerning coercion, and the record as a whole clearly establishes the opposite.

Second, the 1995 Royalty Agreement, extends the period during which royalties would be paid and does not reduce the royalty obligation "on expiration" of the Jensen Patents. However, this agreement does reduce the royalty obligation immediately on its execution, even before the Jensen Patents expire. The justification in cases relating to an initial license for approving an extended period of royalties, if the royalty is reduced upon expiration of the licensed patents, is that such a reduction demonstrates that the parties considered, and placed an appropriate value on, the non-patent elements of the transaction, thereby arguably establishing that the royalty obligation during the extension period was not based on the power of the underlying patents but was for other consideration. In the present case, an immediate reduction of the royalty rate even before the Jensen Patents expired under circumstances where the assignee (SMCCC) already had full rights to the Jensen Patents serves at least the same purpose as a reduced royalty on expiration. Indeed, it is an even stronger circumstance than where the patent owner was still in a position to withhold the basic patent rights for the patent term and could have used such rights to achieve a reduced royalty payment for an extended term after patent expiration.

The reference to patents in the 1995 Royalty Agreement was only used as a convenient marker of time. All of the patents were owned by SMCCC. SMCCC offered the bargain of exchanging a longer royalty period for a different royalty base and a lower royalty rate. The facts in the present case make it clear that the purpose of extending royalty payments at a reduced rate was not to acquire rights under the Jensen Patents, nor coerced by leverage of the Jensen Patents, but was for SMCCC's own business interest and purpose.

7

APR-12-2013  16:08        AMSTER ROTHSTEIN EBENSTIE            1 212 336 8001      P.009

A dispute exists as to how much of a reduction in royalty the 1995 Royalty Agreement really represented over the 1989 Royalty Agreement. CareFusion argues that the royalty reduction was very modest on the grounds that "disposables" were already not royalty bearing, and the fixed amount per device was not that different from the prior royalty. Mr. Ross, who negotiated for SMCCC, testified credibly that the reduction was very significant to him and SMCCC in that the 5% royalty for rentals was reduced to 1%, the royalty on disposables (which Mr. Ross believes could be subject to royalty obligation) were eliminated, and the royalty payable was no longer based on the sale price which Mr. Ross testified he expected would increase. Mr. Ross testified that SMCCC saved $6M, a significant sum.

It is not for the Panel to evaluate the degree of ultimate saving by SMCCC as a result of the 1995 Royalty Agreement. Suffice it to say that Mr. Ross, the negotiator for SMCCC, believed it would constitute a significant royalty reduction as the HFV product went forward into more widespread production and use. Mr. Ross' perception is sufficient and is what motivated the transaction. Tres Tech's negotiator, Mr. Strating, thought the same. What is significant is that the parties viewed the altered royalty conditions requested by SMCCC as a reduction in prospective royalty obligations given in consideration for an extension of the royalty term, a business trade off unrelated to the seeking of a license under the Jensen Patents and not a patent misuse.

Third, while CareFusion argues that royalties paid after 2006 "are due entirely to patents and improvements made by CareFusion" (Post-Hearing Brief, p. 12), the payment of royalties under the 1995 Royalty Agreement is not tied to infringement of the Jensen Patents, CareFusion Patents, or any patents at all. The payments provided for in paragraph III of the 1995 Royalty Agreement provide a fixed fee for every High-Frequency Ventilator ("HFV") manufactured; a

8

APR-12-2013  16:08          AMSTER ROTHSTEIN EBENSTIE                1 212 336 8001     P.010

1% royalty (down from 5%) on the net rental price generated from renting such ventilator; and other royalty obligations for the driver used for a certain purpose. Thus, principal payments depend on the definition of "HFV" which is defined in paragraph I.2. of the 1995 Royalty Agreement as the respirator originally developed by TRI in specific technical terms, namely a respirator which "generates a polarized, variable amplitude, variable frequency pressure wave and has a variable inspiration and expiration ratio and is used in respiratory support." This is the same concept used in the 1984 Agreement. It is not tied to any patent or patent claim. In the 1984 Agreement, royalties were paid on sales of "Equipment" which was defined as incorporating "HFV Technology." This royalty was reduced by 50% if not covered by one or more "Patent Claims," but "Patent Claims" were defined in such a way that they need not be claims of the Jensen Patents.

In the 1995 Royalty Agreement, the definition of "HFV Patents" (Para. I.3.) serves no purpose other than to establish a term for the royalty obligation. Royalties are not based on infringement of such patents. It would not be unreasonable for SMCCC to agree to a negotiated (and reduced) royalty for the original technology transfer during an extension period defined by the existence of one or more patents which could provide some competitive advantage to SMCCC, whether or not such patents were part of the original Jensen Patent family and irrespective of who the inventor was.

In this case, the record establishes that the royalty-bearing products, the 3100A and 3100B, are also covered by the Rautikus and Fox Patents since those patent numbers are marked on those products. This is not to say that royalties are due on infringement of those patents, but only that extending the term in exchange for a reduced royalty for a period during which SMCCC had patent coverage is not an unreasonable step.

9

In addition, in striking the balance between the parties' freedom to contract and the public interest in the restrictions created by patents, the Court has suggested that the existence of a patent on the product diminishes or eliminates the public interest in creating per se restrictions, since the only issue is who owns the patent and what is paid between the parties, not the public's freedom to operate. Transparent-Wrap Machine Corp. v. Stokes & Smith Co., 329 U.S. 637 (1947). This also tends against the concept of patent misuse here because the public's freedom to operate has not been affected by the 1995 Royalty Agreement.

In summary then, Brulotte is intended to prevent a misuse of the power of a patent to obtain extended benefits, which has no application to the business deal which SMCCC requested and Tres Tech agreed to in the 1995 Royalty Agreement. As part of that business deal, the parties to that agreement agreed on a reduced royalty which took effect immediately, and which they believed was in their mutual best interests, knowing that SMCCC had full rights to the Jensen Patents in any case. That agreement was simply a negotiated business deal between those parties which does not have any adverse impact on the public interest and does not constitute patent misuse.

In its closing argument, CareFusion conceded that royalties were due through the term of the Rautikus Patent, which expired on April 1, 2012, unless extending the royalty obligation beyond 2006 constituted a patent misuse under Brulotte and related cases. Given the Panel's unanimous decision on patent misuse, the Panel initially finds that such royalties were due and owing under the terms of the 1995 Agreement at least until expiration of the Rautikus Patent on April 1, 2012.

APP.014

## Expiration of the 1995 Royalty Agreement

This leaves as the remaining issue in dispute whether the 1995 Royalty Agreement expired in 2012 or whether the agreement continues and royalties are due thereafter.

Tres Tech has now disclaimed any claim for a continuation of the 1995 Royalty Agreement based on other patents beyond the expiration of the Fox Patent on March 17, 2018. The issue for the Panel then is whether the 1995 Royalty Agreement expired on April 1, 2012 or expires on March 17, 2018.

On this issue, the controlling language is found in two paragraphs of the 1995 Royalty Agreement.

First, Paragraph II provides that the 1995 Royalty Agreement "will continue in force through the expiration of the last of the HFV Patents, unless sooner terminated as provided herein." As indicated previously, the HFV Patents and their expiration dates are essentially used in the 1995 Royalty Agreement only as a time marker to establish the expiration date of the Agreement.

"HFV Patents" are defined in Paragraph I.3 of the 1995 Royalty Agreement as follows:

> I.3      HFV PATENTS.  The term "HFV Patents" shall mean the United States and foreign patents relating to high frequency ventilators which are owned by SMCCC subject to royalty and other obligations previously set forth in the Patent and Technology Transfer, Manufacturing and Marketing Agreement.  These patents include U.S. Patent Nos.  4,719,910;  4,747,402;  4,805,612; 4,821,709; 5,307,794 as well as all patents which were the subject of the Patent and Technolngy Transfer, Manufacturing and Marketing Agreement.

11

APR-12-2013 16:09 ¨AMSTER ROTHSTEIN EBENSTIE 1 212 336 8001 P.018

The meaning of these two sentences controls the issue of whether the definition of HFV Patents does or does not include the Fox Patent, and has been a principal issue of dispute between the parties in this matter throughout the arbitration, at the Hearing and in the Post-Hearing Briefs.

The parties stipulated that the first four patent numbers specifically listed in the second sentence in the definition of "HFV Patents" are the Jensen Patents referred to previously in this Award. The fifth patent specifically listed in the second sentence is the Rautikus Patent discussed previously. The parties also stipulated that the only patents that were granted from the patent applications listed on Exhibit A of the 1984 Agreement, including any continuations, continuations-in-part, divisions, reissues or any other patent claiming priority to any such patent applications were the first four patents listed in the second sentence of Paragraph I.3, i.e. the Jensen Patents. As discussed previously, in view of the Panel's decision on patent misuse, the 1995 Royalty Agreement continued at least until the expiration of the Rautikus Patent, the fifth patent listed in the second sentence.

The principal dispute between the parties is whether the Fox Patent, U.S. Patent No. 6,085,746, which was filed March 17, 1998, issued on July 11, 2000 and expires on March 17, 2018 is an "HFV Patent" within the meaning of Paragraph I.3 of the 1995 Royalty Agreement. The parties agree that the Fox Patent is not listed in the definition of HFV Patents, and was not a patent transferred from TRI to Gould pursuant to the 1984 Agreement. These agreements set the stage for the issue of whether the Fox Patent is or is not an HFV Patent within the meaning of Paragraph I.3 of the 1995 Royalty Agreement. Again, if not, the Agreement expired at the expiration of the Rautikus Patent on April 1, 2012: if so, the Agreement will expire at the expiration of the Fox Patent on March 17, 2018.

12

APR-12-2013 16:09       AMSTER ROTHSTEIN EBENSTIE          1 212 336 8001    P.014

The Fox Patent relates to an improved HFV apparatus which is similar to the initial Jensen apparatus but uses multiple magnets and a strengthened 'spider' mechanism in conjunction with its coil to increase the volume of gas flow with reduced noise. The increased gas flow substantially prevents overheating when an internal diaphragm is heavily driven, thus making this arrangement more suitable for use with larger patients, primarily adults. The commercial embodiment of the Fox structure is apparently the 3100B product design.

CareFusion argues that the Fox Patent does not meet the first sentence of the I.3 definition because it was not "owned by SMCCC subject to royalties and other obligations previously set forth" in the 1984 Agreement. CareFusion points out that the definition of "HFV Patents" in the 1984 Agreement (Section 1.5) are patents "owned by TRI" and resulting from the patent applications in Exhibit A attached to the 1984 Agreement. The Fox Patent was never owned by TRI and the invention of the Fox Patent was developed by CareFusion independently of Tres Tech or its predecessor TRI, indeed after the 1995 Royalty Agreement was executed.

CareFusion also argues that, while TRI assigned to Gould and its successors the "HFV Technology" as defined in the 1984 Agreement, the invention of the Fox Patent is not "HFV Technology" per se within the meaning of Paragraph 1.7 of the 1984 Agreement because the Fox invention was not owned by TRI on the effective date in 1984. While TRI also assigned to Gould and its successors "Improvements" in the 1984 Agreement, CareFusion argues that the Fox Patent invention is not an Improvement within the meaning of Section 1.8 of the 1984 Agreement because it was not developed by TRI or its successor Tres Tech, and the term "Improvement" is defined in the 1984 Agreement as any improvement or invention affecting high frequency ventilators which is "developed by TRI" after the effective date of the 1984 Agreement.

13

CareFusion argues that these provisions concerning "HFV Patents," "HFV Technology" and "Improvements" are the only provisions of the 1984 Agreement which could create "royalty and other obligations" under the 1984 Agreement as they read that language in the definition of HFV Patents in the first sentence of I.3 of the 1995 Royalty Agreement, and that the Fox Patent does not come under any of those obligations.

Finally, CareFusion argues that the Fox Patent does not meet the second sentence of the HFV Patent definition because it is not specifically listed in this sentence and the reference to "all patents which were the subject of" the 1984 Agreement does not include the Fox Patent invention as indicated above.

CareFusion argues that the language of I.3 is clear and that the Panel need not look to parol evidence to understand its meaning. They point to the integration clause in the 1995 Royalty Agreement, Par. X.12, and argue that what they view as the clear meaning of Par. I.3 must control.

Tres Tech, of course, takes a contrary view.

Tres Tech argues that the Fox Patent is not identified in the list of patents in the second sentence of paragraph I.3 only because it was not filed at the time the 1995 Royalty Agreement was executed. It argues that if the first sentence of the definition is read in the manner proposed by CareFusion, then the only patents referred to in the first sentence are, at most, the four Jensen Patents. It argues that when the second sentence says "These patents include . . ." and lists five patents, including the Rautikus Patent, this indicates that the parties intended that patents defined in the first sentence include more than the four Jensen Patents. Tres Tech, in effect, argues that the first sentence cannot be read as restrictively as CareFusion proposes because it provides no explanation for why the phrase "These patents include . . . ." is used with regard to the Rautikus

14

Patent if it is not one of the included patents in the first sentence. It argues that if CareFusion's analysis is accepted, then the only patents that meet the definition would be the Jensen Patents, and there would be no extension of the royalty period. Tres Tech argues that, in terms of what should be included in the first sentence, there is no distinction between the Rautikus Patent and the Fox Patent, except that the Rautikus Patent was already issued and is therefore listed, the Fox Patent was not yet filed and is, therefore, not listed.

Referring to the first sentence then, Tres Tech basically argues that the reference to patents related to high frequency ventilators that are "subject to royalty and other obligations" previously set forth in the 1984 Agreement was intended to take account of the fact that the royalty obligation under the 1984 Agreement is not tied to patents. They argue that the "royalty and other obligations" under the 1984 Agreement is contained in Paragraph 3.1 of that agreement which calls for royalties on "Equipment." "Equipment" is defined in Paragraph 1.14 of that Agreement as "apparatus or systems incorporating HFV Technology," with HFV Technology broadly encompassing the technology from TRI to Gould "whether or not patentable." The argument is that patents "subject to royalty and other obligations" means patents that cover, or in patent terms that claim, subject matter which would be subject to such obligations. In effect, Tres Tech argues that while the asserted inventive improvement of the Rautikus and Fox Patents may not meet the definition of Improvements in the 1984 Agreement, the inventions covered by the Rautikus and Fox Patents and any product under those patents would have been "subject to royalty and other obligations under the 1984 Agreement" since the patents require use of the basic HFV Technology provided by TRI. Thus, Tres Tech reads the first sentence as including patents on inventions which require the HFV Technology of TRI.

15

Tres Tech further argues that both Mr. Strating on behalf of Tres Tech and Mr. Ross, the negotiator on behalf of SMCCC, testified that they intended the broader meaning of HFV Patents and that other evidence supports this interpretation. Tres Tech argues that the language of Par. I.3 clearly has the meaning they ascribe to it.

The Panel has considered both sides' positions in great detail.

First, the Panel notes that the 1995 Royalty Agreement, in spite of it being drafted and revised over a period of six months, is not drafted with the care and attention that might normally be expected in an agreement of this sort. There are definitions in the agreement which are not used in the substantive provisions, there are confusing disconnects among the terms used in the agreement, and other factors that leave the agreement less than clear in many respects. The most significant among these for present purposes is in the issue in the paragraph under discussion, namely the confusion caused by the inclusion of the Rautikus Patent in language that suggests that it is one of the patents generally referred to in the first sentence ("These patents include . . .").

There has been the suggestion that Rautikus may have been added by mistake, but there is insufficient evidence to support such suggestion. There is the possibility that Rautikus was added with the intention that it be the only patent included in addition to the Jensen Patents, but the language of Paragraph I.3 does not support this suggestion and the testimony of both negotiators contradict the position that the parties intended to add only one specific patent to the exclusion of any others.

The Panel has looked to other terms of the 1995 Royalty Agreement to see if this confusion is resolved by the application of other provisions. For example, there has been discussion of Paragraph VII on Improvements indicating, for example, that in VII.3 (added

16

during the negotiations of the 1995 Royalty Agreement) there is a specific provision providing that "improvement by SMCCC in the HFV Patents or HFV Technology" will constitute Equipment (either Category 1 Equipment or Category 2 Equipment) and would be royalty bearing under the 1995 Royalty Agreement. Tres Tech argues that since Paragraph VII.3 contemplated royalties on SMCCC improvements and new patents, this suggests that it was the intention of the parties that the agreement continue to include such patents to further extend its term. While the Panel understands Tres Tech's argument, it is not definitive on this issue as to the term "HFV Patents" as defined in Par. I.3.

On balance, a majority of the Panel finds that the definition of "HFV Patents" in I.3 is ambiguous. Such ambiguity which is not clarified sufficiently by other terms of the agreement brings into play parol evidence in spite of the integration clause, including the negotiation history of the 1995 Royalty Agreement and whatever such negotiation establishes about the intent of the parties. The Panel thus has considered the parol evidence.

Parol evidence in this case has been provided primarily by the direct testimony and cross-examination testimony of the two negotiators who negotiated the 1995 Royalty Agreement and by the drafting history of the agreement which helps provide instruction as to what the parties intended.

Testimony on behalf of the Tres Tech side of the negotiation was provided by Mr. Strating who, of course, has a significant financial interest in the outcome of this proceeding and whose memory was vague. It was also provided by Mr. Ross, no longer associated with either of the companies, who negotiated on behalf of SMCCC. Mr. Ross had no interest in the outcome of the proceeding, although he was called as a witness by Tres Tech and concedes a friendship with Mr. Strating. There was also testimony that Mr. Ross is currently in negotiations with

17

CareFusion concerning a dental business venture with which he is involved and for which CareFusion is a supplier, and that his interests may be adversely impacted to the extent that his testimony was contrary to the interests of CareFusion.

While the 1995 Royalty Agreement, in the last Whereas clause on page 1, indicates that the agreement "supersedes and replaces the previous agreements," it expressly indicates (as the 1989 Royalty Agreement did not) that that replacement is "except as provided herein." As indicated above, Paragraph I.3 refers to the 1984 Agreement. Surprisingly, both Mr. Strating and Mr. Ross, at the time of their testimony in this proceeding, seemed unclear about the terms and conditions of the 1984 Agreement. Both testified that at the time of the negotiations of the 1995 Royalty Agreement, and in spite of the reference to the 1984 Agreement in the paragraph now crucial to the remaining issue in this Arbitration, neither of them was familiar with the 1984 Agreement. This suggests that neither party intended a close reading of the 1984 Agreement and that such close reading is not likely to clarify the parties' intentions. Indeed, if the 1984 Agreement was read closely, one could argue that some of the Jensen Patents were not to be included since the definition of HFV Patents in the 1984 Agreement literally does not refer to possible continuations in part of the original applications.

Looking to the parol evidence, both Mr. Strating and Mr. Ross testified that it was their intention in entering into the 1995 Royalty Agreement that, by extending the term of the agreement for the life of "HFV Patents," they intended to include in HFV Patents improvement patents by either party which relied on the underlying HFV Technology created by TRI. A question has been raised as to how Mr. Ross could have intended to leave the term of the 1995 Royalty Agreement so open ended. The answer that comes out of the testimony is that he never expected the basic HFV Technology to survive and thrive as long as it has, and was willing to let

18

APR-12-2013  16:11        AMSTER ROTHSTEIN EBENSTIE                1 212 336 8001    P.020

it continue on an open-ended basis as long as he reduced his company's royalty obligations -- achieving that reduction was his goal.

It is rare in the Panel's experience to have direct testimony from the negotiators for both sides of an agreement in virtually complete agreement as to their intention. As indicated previously, both negotiators appear to have taken a broad view of the meaning of patents relating to high frequency ventilators which are "subject to royalty and other obligations previously set forth" in the 1984 Agreement, confirming the Tres Tech reading of Par. I.3. Their testimony suggests a belief that patents subject to royalties or obligations included not merely the original applications, but patented subject matter which would have been subject to royalties or other obligations under the broad payment obligations of the 1984 Agreement because they were directed to the high frequency ventilators of TRI.

The development of the 1995 Royalty Agreement over the six months of negotiations also gives support to Tres Tech's interpretation of Par. I.3. For example, a prior draft of the agreement, previously before the Panel as Joint Exhibit 1, contains a specific provision in Par. II limiting the term of the agreement to "seventeen (17) years from May 1994" the anticipated expiration of the Rautikus Patent. If the parties meant to terminate the agreement on expiration of the Rautikus Patent, they could have left that explicit language and not made the changes contained in the final version of the 1995 Royalty Agreement.

In addition, CareFusion points out that in an initial draft of the Agreement provided to Tres Tech (Joint Exhibit 51), SMCCC proposed that the agreement remain in force for 21 years from its initial date, i.e., to a date in 2016. Why would Tres Tech in the final version of the agreement trade an expiration offered for 2016 for an expiration based on the Rautikus Patent which expired in 2012?

19

APR-12-2013  16:12        AMSTER ROTESTEIN EBENSTIE        1 212 336 8001     P.021

The broader interpretation of Par. I.3 is also consistent with the concept initially proposed by SMCCC at the time they first raised the subject of revising the 1989 Agreement. The argument made was that reducing the royalty would open the door to SMCCC further developing new and improved technology which would enhance and extend the prospects for the technology. While not explicitly tied to an extension of the term, this proposal does support an understanding on Tres Tech's part that Tres Tech would benefit by such improvement and extension based on the extended technology. One of those areas of extended technology is the adult application inherent in the Fox Patent.

On balance, a majority of the Panel finds it appropriate to give effect to the intention of the parties at the time of the 1995 Royalty Agreement based on the credible evidence admitted at the Hearing and to include the Fox Patent in the definition of HFV Patents in Paragraph I.3 so that the agreement expires March 17, 2018. The Panel also accepts Tres Tech's undertaking that it will not seek any further extension of the term beyond the expiration of the Fox Patent.

Based upon the analysis of the evidence and the arguments submitted by the parties, and upon our evaluation of the credibility of the witnesses' testimony, the Panel determines:

1.      Unanimously, that enforcement of the 1995 Royalty Agreement after 2006 does not constitute patent misuse and CareFusion's counterclaim is DENIED.

2.      By majority, that the term of the 1995 Royalty Agreement expires at the expiration of the Fox Patent on March 17, 2018 and royalties pursuant to the terms of the 1995 Royalty Agreement are due pursuant to the Agreement's terms until that date.

3.      Unanimously, that the Parties' crossclaims for counsel fees be, and the same hereby are DENIED, and each party shall bear its own attorneys fees and costs.

APP.024

4.    The administrative filing and case service fees of the AAA, totaling $20,150.00, shall be borne equally.  The fees and expenses of the arbitrators, totaling $176,290.69, shall be borne equally.  Therefore, Tres Tech Corporation shall reimburse CareFusion Corporation the sum of $1,374.99, representing that portion of said fees and expenses in excess of the apportioned costs previously incurred by CareFusion Corporation.

This Award is in full settlement of all claims and counterclaims submitted in this arbitration.  All claims not expressly granted herein are hereby DENIED.

This Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument as in the attached.

4/12/13
_____
Date

_____
Daniel Ebenstein, Chair

_____
Date

_____
Peter Michaelson

_____
Date

_____
James J. Kozuch

21

I, Daniel Ebenstein, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

——————————————      ——————————————
4/12/13            *[signature]*
Date            Daniel Ebenstein, Chair

I, Peter Michaelson, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

——————————————      ——————————————
Date            Peter Michaelson

I, James J. Kozuch, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

——————————————      ——————————————
Date            James J. Kozuch

4.      The administrative filing and case service fees of the AAA, totaling $20,150.00, shall be borne equally.  The fees and expenses of the arbitrators, totaling $176,290.69, shall be borne equally.  Therefore, Tres Tech Corporation shall reimburse CareFusion Corporation the sum of $1,374.99, representing that portion of said fees and expenses in excess of the apportioned costs previously incurred by CareFusion Corporation.

This Award is in full settlement of all claims and counterclaims submitted in this arbitration.  All claims not expressly granted herein are hereby DENIED.

This Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument as in the attached.

_____                    _____
        Date                                           Daniel Ebenstein, Chair


_____                    _____
        Date                                           Peter Michaelson


_____                    _____
   4/12/2013                                         James J. Kozuch
        Date


21

I, Daniel Ebenstein, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

_____                    _____
        Date                                Daniel Ebenstein, Chair

I, Peter Michaelson, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

_____                    _____
        Date                                    Peter Michaelson

I, James J. Kozuch, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

4/12/2013                                  _____
_____
        Date                                    James J. Kozuch

22

APP.028

4.      The administrative filing and case service fees of the AAA, totaling $20,150.00, shall be borne equally.  The fees and expenses of the arbitrators, totaling $176,290.69, shall be borne equally.  Therefore, Tres Tech Corporation shall reimburse CareFusion Corporation the sum of $1,374.99, representing that portion of said fees and expenses in excess of the apportioned costs previously incurred by CareFusion Corporation.

This Award is in full settlement of all claims and counterclaims submitted in this arbitration.  All claims not expressly granted herein are hereby DENIED.

This Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument as in the attached.

| | |
|---|---|
| _____ | _____ |
| Date | Daniel Ebenstein, Chair |
| *April 13, 2013* | |
| _____ | _____ |
| Date | Peter Michaelson |
| | |
| _____ | _____ |
| Date | James J. Kozuch |

21

APP.029

I, Daniel Ebenstein, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

_____          _____
            Date                                    Daniel Ebenstein, Chair

I, Peter Michaelson, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

_April 13, 2013_____          _Peter Michaelson_____
            Date                                    Peter Michaelson

I, James J. Kozuch, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

_____          _____
            Date                                    James J. Kozuch

22

# EXHIBIT B

## ROYALTY AGREEMENT

This agreement (hereinafter Agreement) is made and entered into as of the 1st day of July, 1995, by and between SensorMedics Critical Care Corporation, a California corporation having its principal place of business at 22705 Savi Ranch Parkway, Yorba Linda, California, 92687 (hereinafter SMCCC), and Tres Tech Corporation, a Texas corporation having its principal place of business at 1201 Vassor Circle, Plano, Texas 75075 (hereinafter Tres Tech).

### WITNESSETH

WHEREAS, Texas Research Incorporated has developed an improved high frequency ventilator, (as defined in paragraph I.2), having application for treatment of humans and animals, and

WHEREAS, Texas Research Incorporated had previously signed a "Patent and Technology Transfer, Manufacturing and Marketing Agreement", with Gould, Inc. and

WHEREAS, SensorMedics Corporation acquired from Gould, Inc. all its right, title and interest in and to its patents and patent applications pertaining to the high frequency ventilator technology and its proprietary technical information, and

WHEREAS, SensorMedics Corporation has transferred all its rights, title and interest in and to its patents and patent applications pertaining to the high frequency ventilator technology and its proprietary technical information to SMCCC, and

WHEREAS, Tres Tech acquired by purchase all of the assets of Texas Research Incorporated, and among these assets is the aforementioned Patent and Technology Transfer, Manufacturing and Marketing Agreement, and

WHEREAS, SMCCC and Tres Tech agree that, except as provided herein, this new Agreement supersedes and replaces all previous agreements and contracts, including the aforementioned Patent and Technology Transfer, Manufacturing and Marketing Agreement and the Royalty Agreement between SensorMedics Corporation and Tres Tech dated August 7th, 1989.

1

## I. DEFINITIONS

For the purpose of this Agreement, the following terms shall have the meanings ascribed to them by this Article I.

I.1     AFFILIATES.  The term "Affiliates" shall mean any individual, corporation, partnership, firm or other entity:  (i)  Which shall be controlled directly or indirectly by SMCCC, or (ii) in which SMCCC shall directly or indirectly own or control at least twenty five percent (25%) of the stock or voting rights, or (iii) shall directly or indirectly own or control at least twenty five percent (25%) of the stock or voting rights of SMCCC, or (iv) which shall act as a licensee or assignee of SMCCC.

I.2     HIGH FREQUENCY VENTILATOR.   The term "High Frequency Ventilator" or "HFV" shall mean the ventilator for supporting respiration developed by Texas Research Incorporated, which ventilator generates a polarized, variable amplitude, variable frequency pressure wave and has a variable inspiration to expiration ratio and is used in respiratory support.

I.3     HFV PATENTS.  The term "HFV Patents" shall mean the United States and foreign patents relating to high frequency ventilators which are owned by SMCCC subject to royalty and other obligations previously set forth in the Patent and Technology Transfer, Manufacturing and Marketing Agreement.  These patents include U.S. Patent Nos.  4,719,910; 4,747,402; 4,805,612; 4,821,709; 5,307,794 as well as all patents which were the subject of the Patent and Technology Transfer, Manufacturing and Marketing Agreement.

I.4     CLAIM.  The term "Claim" shall mean a claim in an issued, unexpired and viable patent, which claim has not been declared invalid or unenforceable by an order of a competent court or other tribunal from which no appeal has or can be taken.

I.5     HFV TECHNOLOGY.  The term "HFV Technology" shall mean all technical information whether or not patentable relating to high frequency ventilators which is owned by SMCCC subject to obligations previously set forth under the Patent and Technology Transfer, Manufacturing and Marketing Agreement, including but not limited to its product descriptions, manufacturing specifications, quality control specifications and techniques, bills of material, test procedures, software, data, drawings, know-how and trade secrets.

 2

APP.033

I.6 SALES. The term "Sale" or "Sales" shall mean transfers of ownership or permanent transfers of possession or control.

1.7 AUXILIARY EQUIPMENT. "Auxiliary Equipment" shall mean any equipment sold with High Frequency Ventilators but is not included as part of the HFV Technology. The known list of Auxiliary Equipment sold with the High Frequency Ventilator includes humidifiers, oxygen blenders, patient circuits, Nitric Oxide analyzers, and Nitric Oxide injectors. Tres Tech will be notified in writing by SMCCC if additional equipment is to be considered as Auxiliary Equipment.

I.8 NET SELLING PRICE. The term "Net Selling Price" shall mean the gross amount received for sales by SMCCC of products using the HFV Technology less any charges for transportation, insurance, sales taxes, and less any prompt payment or dealer discounts actually taken, and less the retail price for any Auxiliary Equipment sold with High Frequency Ventilators. Notwithstanding anything else contained in this definition, the Net Selling Price shall be the gross amount received for sales to the end-user, less the deductions referenced in the preceding sentence, and any royalty payment shall be based upon the gross amount received for sales to the end-user, less the deductions referenced in the preceding sentence.

I.9 RENTALS. The term "Rentals" shall mean any temporary use which is not a sale. Rentals will not include revenue generated from contractual agreements between SMCCC and end-users where SMCCC supplies other services in addition to supplying HFV.

1.10 NET RENTAL PRICE. The term "Net Rental Price" shall mean the gross amount received from rentals of products using the HFV Technology less any charges for transportation, insurance, sales taxes, and less any prompt payment or dealer discounts actually taken, and less the rental price for Auxiliary Equipment rented with High Frequency Ventilators.

I.11 DRIVER. The term "Driver" shall mean a linear motor and piston assembly which is a component of a high frequency ventilator.

I.12 EQUIPMENT. The term "Equipment" shall mean apparatus or systems incorporating HFV Technology. Equipment shall be classified in one of the following two categories: (a) CATEGORY ONE EQUIPMENT shall be types, models, drawings and embodiments of High Frequency Ventilators, specifically, but not limited to: (1) Human versions which are designed to be used to treat human beings. (2) Veterinarian versions which are designed to be used to treat animals. (b) CATEGORY TWO EQUIPMENT shall be apparatus and systems incorporating HFV

 3

Technology which apparatus and systems are developed and/or purchased by SMCCC and not part of the HFV Technology.

1.13 QUARTER. The term "Quarter" shall mean one of the four calendar quarters beginning January 1 and extending until March 31, beginning April 1 and extending until June 30, beginning July 1 and extending until September 30, and/or beginning October 1 and extending until December 31 as the context requires.

## II. EFFECTIVE DATE AND TERM

The Effective Date of this Agreement shall be July 1, 1995. This Agreement will continue in force through the expiration of the last of the HFV Patents, unless sooner terminated as provided herein.

## III. CONSIDERATION

III.1 In consideration for the rights granted to SensorMedics Corporation by the Patent and Technology Transfer, Manufacturing and Marketing Agreement acquired by Tres Tech and carried forward in this agreement, Gould had previously made a payment of $300,000 and SensorMedics Corporation has previously paid $200,000. Earned Royalty Fees payable for the term of this Agreement shall be calculated as follows:

1.   Subject to paragraph III.2, eleven hundred dollars ($1,100) Royalty Fee for any High Frequency Ventilator manufactured.
2.   One percent (1%) of the Net Rental Price generated from rental of the High Frequency Ventilator.
3.   Five percent (5%) of Net Selling Price in addition to a fixed one hundred twenty dollars ($120) for each unit using The Driver and used solely for the purpose of removing secretions from the lung. The Net Selling Price will be for the Category One Equipment which excludes Auxiliary Equipment.
4.   In the event it is determined by a U.S. court that an entity other than Tres Tech is entitled to any portion of the royalties payable under this Agreement, SMCCC shall be entitled to a reduction in royalties equal to the future lessened value of this license as determined by the arbitration process set forth in this Agreement.

4

5.  Royalty for Category Two Equipment will be negotiated between representatives of Tres Tech and SMCCC and shall occur after development of the device by SMCCC and before sales of such device take place.

6.  A volume discount on the Royalty Fee shall be given in any quarter where the number of ventilators manufactured exceeds 90 units.  A one hundred dollar ($100) reduction in Royalty Fee will be applied to units 91 through 120.  A two hundred dollar ($200) reduction in Royalty Fee will occur on any units greater than 120.

III.2   At the end of each calendar year SMCCC will calculate the average Net Selling Price for High Frequency Ventilators sold in the United States by SMCCC to end-users in that year.  The following table will be used to adjust the above Royalty Fee for High Frequency Ventilators manufactured in the following year.  If the number of High Frequency Ventilators sold in the United States is under 30 units, the Royalty Fee will remain unchanged for that year.  The first calendar year in which average Net Selling Price shall first be calculated will be 1996.  Therefore, the potential adjustment will begin in calendar year 1997.

| Net Average Selling Price | Royalty Fee |
|---|---|
| $42,001 + | $2,300 |
| $36,001 - $42,000 | $2,050 |
| $30,001 - $36,000 | $1,750 |
| $18,001 - $30,000 | $1,100 |
| $12,001 - $18,000 | $  850 |
| $ 6,001 - $12,000 | $  550 |
| $  0      - $ 6,000 | $  250 |

III.3(a)    SMCCC shall provide to Tres Tech, as part of the quarterly report, any and all information necessary for Tres Tech to understand and evaluate how the Net Rental Price and the Net Selling Price has been determined, including, but not limited to, a description of the Auxiliary Equipment, personnel and services furnished with the Rental of the High Frequency Ventilator, the cost to SMCCC of furnishing and the amount charged the customer for the Auxiliary Equipment, personnel and services, the Net Selling Price for the Category One Equipment and Auxiliary Equipment used solely for the purposes of removing secretions from the lung, and the development cost and other costs attributable to the development of Category Two Equipment so that Tres Tech will have sufficient information to  evaluate the sufficiency of the royalty paid and/or to negotiate or arbitrate for a reasonable royalty in the case of Category Two Equipment.

(b)    In the event the parties are unable to agree on the royalty for Category Two Equipment pursuant to III.1.5, parties agree that this matter may be submitted to arbitration and the par-



5

ties will be bound by the royalty determined by the arbiters to be a fair and reasonable royalty to be paid for Category Two Equipment. It is specifically recognized by the parties that the appropriate royalty for Category Two Equipment may vary from time to time so that the royalty can be based upon a percentage of Net Selling Price as determined by the arbiters.

(c)     Any disagreement as to the allocation of the Net Selling Price or Net Rental Price between products using the HFV Technology and any Auxiliary Equipment, personnel or services which cannot be resolved by the parties shall be submitted to arbitration pursuant to X.8.

## IV. ACCOUNTING AND REPORTING

IV.1   SMCCC and its affiliates and licensees shall keep its books and records according to GAAP, including records of every ventilator and driver manufactured and its whereabouts for the purpose of calculating royalty. SMCCC shall permit, and will require affiliates or licensees to permit, representatives of Tres Tech to examine their books and records providing, however, that: (i) The representatives elected by Tres Tech shall be persons to whom SMCCC and affiliates or licensees have no reasonable objection, (ii) The examination and inspection of the records and books shall not occur more than twice in any calendar year, unless SMCCC is in default in making timely royalty and other payments; (iii) Tres Tech shall retain in confidence and not disclose to any third party any information of which it may become aware of in the course of any such examination except to enforce its rights pursuant to this Agreement; (iv) SMCCC and affiliates or licensees shall be obligated to retain such books and records for a period of five years from consummation of sales and from five years from the expiration of rental agreements.

IV.2   Beginning July 1, 1995 and during the remaining term of this Agreement, after the first sale or rental of High Frequency Ventilator by SMCCC or affiliates or licensees and during the remaining term of this agreement, SMCCC shall submit to Tres Tech on or before the 30th day of January, April, July, and October a written statement setting forth the quantities, and royalty fee basis of equipment subject to the payment of royalty fees during the preceding Quarter. Such statements shall be accompanied by payment of royalty fees in the amount shown thereby to be due Tres Tech. After the first such statement, subsequent statements shall be submitted even if there were no sales or rentals of high frequency ventilators made by SMCCC or affiliates or licensees during any three month reporting period. SMCCC shall be responsible for the payment of all royalties for equipment sold or rented by SMCCC, its affiliates and licensees.

6

IV.3  Notwithstanding anything herein to the contrary, a minimum payment of seventy thousand dollars ($70,000) will be made to Tres Tech by SMCCC on each of the payment dates specified in IV.2 above if SMCCC's total revenue (gross receipts from any and all sources before deduction of any expenses) for the corresponding period exceeds two million, five hundred thousand dollars ($2,500,000).  If the minimum payment exceeds the amount earned by Tres Tech as defined in Section III Consideration of this contract, the difference between the minimum payment and earned payment will be subtracted from subsequent payments which exceed the minimum payment.  The cumulative difference obtained by subtracting the earned royalty from the minimum payment ("Excess Payment") will be carried through until the beginning of the last year of the contract.  The minimum payment will not be in force for the last four quarterly payments made pursuant to this Agreement and any Excess Payment will be deducted from the royalty earned in the last four Quarters.  Tres Tech shall not be liable for any Excess Payment except by deducting any such Excess Payments from the last four quarterly royalty payments.

## V. CONFIDENTIALITY

V.1  During the term of this agreement:  (a) Tres Tech shall not and it shall take every reasonable precaution to see that its employees, representatives and agents shall not divulge or disclose to any other person in any manner, directly or indirectly, the HFV Technology and improvements, nor any business or technical information which its employees, representatives or agents may obtain from visiting any facility of SMCCC; and (b) Except for information within the public domain, Tres Tech shall take every reasonable precaution to see that its employees, representatives and agents shall not use in any manner, or enable any other entity to use in any manner, directly or indirectly, information pertaining to the high frequency ventilator or SMCCC' business information relating thereto.

V.2  During the term of this agreement, SMCCC shall maintain and will require affiliates or licensees to maintain the HFV Technology in confidence unless and until, as to any portion of the HFV Technology and improvements:  (a) through no fault of SMCCC or affiliates or licensees the HFV Technology and improvements fails within the public domain; or (b) Is or becomes available on a non-confidential and unrestricted basis to SMCCC or affiliates or licensees from a third party; or (c) Is disclosed by Tres Tech to others on a non-confidential and unrestricted basis.

V.3  Neither party shall be liable for inadvertent disclosure or use of the information specified in paragraphs V.1 and V.2 above provided that:  (1) It uses the same degree of care and safeguarding such information as it uses for other confidential information of like importance; and

 7

(2) Upon discovery of any such inadvertent disclosure or use, it shall immediately notify the other party in writing and use its best efforts to prevent any further disclosure or use.

V.4   DISCLOSURE OR USE.   As may be necessary to the commercial exploitation of the high frequency ventilator, SMCCC and Tres Tech may transmit HFV Technology to third parties but only after receipt of such third party's written undertaking to maintain the confidentiality to the same extent as provided in paragraphs V.2 and V.3 above.

## VI. WARRANTIES

VI.1   SMCCC warrants and represents that it will use its best efforts to manufacture and market High Frequency Ventilators and HFV Technology.

VI.2   SMCCC hereby warrants and represents that it will use its best efforts to ensure that the HFV Patents are not infringed by any other party, including, but not limited to the institution of patent infringement lawsuits, unless otherwise agreed by the parties to this Agreement. The expense of such suits to protect the rights in the HFV Patents shall be born entirely by SMCCC, and any and all recoveries from said suit or settlements shall go to SMCCC.

VI.3   Should SMCCC not take the necessary steps by litigation or otherwise to stop infringement of the HFV Patents, then Tres Tech may conduct at its own expense, and with the right to all recoveries, such litigation as it may deem necessary, provided that Tres Tech has first given a written thirty (30) day notice to SMCCC of its intention to initiate such litigation.

VI.4   SMCCC agrees that Tres Tech does not warrant that the HFV Patents and HFV Technology do not infringe any patent rights or other rights of any person, firm, company, or third party.

VI.5   SMCCC will timely pay all fees in connection with the obtaining, issuance, and maintenance of patent applications and patents, if any, to be licensed by Tres Tech to SMCCC under this Agreement.   SMCCC will provide Tres Tech with a listing of all of the HFV Patents covered by this Agreement, together with a schedule showing when their maintenance fees are required to be made to the U.S. Patent and Trademark Office.   SMCCC will deliver proof to Tres Tech of SMCCC's payment of all required maintenance fees not later than two months prior to the maintenance fee becoming due.   If SMCCC fails to provide evidence of its timely payment of the maintenance fees for an HFV Patent, Tres Tech will pay the maintenance fee and SMCCC shall

8

reimburse Tres Tech the amount of any amounts paid in maintenance fees pursuant to this paragraph.

## VII. IMPROVEMENTS

VII.1  SMCCC shall have the right to file patent applications on improvements in High Frequency Ventilator or HFV Technology.  Tres Tech agrees to disclose improvements in High Frequency Ventilator and/or HFV Technology to SMCCC in writing promptly after they are made. Tres Tech also agrees, at the request and expense of SMCCC, to do any affirmative acts reasonably required to invest in SMCCC all rights of ownership in patent applications filed on improvements and any patents that may be granted therefrom on High Frequency Ventilator and/or HFV Technology, and to assist and cooperate with SMCCC in the preparation, prosecution and enforcements of said applications and patents, including but not limited to the making of oaths and declarations and the giving of testimony.

VII.2  SMCCC shall advise Tres Tech of SMCCC's intention in respect to filing a patent application on any improvement, within ninety (90) days after such improvement is disclosed to SMCCC.  Should SMCCC elect not to file a patent application on any improvement, Tres Tech may, at its expense, file patent applications thereafter at the written request and expense of Tres Tech.  SMCCC agrees to assign such patent application and any patents that may be granted therefrom to Tres Tech.  With respect to any patent application or patent assigned by SMCCC to Tres Tech pursuant to the paragraphs VII.1 and VII.2, any such patent application or patent shall be deemed to be Category Two Equipment.

VII.3  SMCCC agrees that for any improvements by SMCCC in the HFV Patents or HFV Technology that said improvements shall be deemed to be either Category One Equipment or Category Two Equipment, as applicable.

9

## VIII. COMPETITION IN FIELD PROSCRIBED; DEVELOPMENTS OUTSIDE FIELD

VIII.1 (a)    Tres Tech agrees that during the term of this agreement it will not compete with SMCCC in the field of high frequency ventilators nor assist any third party to compete with SMCCC in such field.

(b)    Tres Tech hereby grants SMCCC a right of first refusal in respect to the exclusive right to commercialize any developments made by Tres Tech outside the field of high frequency ventilators, and agrees to negotiate with SMCCC in good faith concerning such right.

## IX. TERMS AND CONDITIONS

IX.1   Tres Tech shall have the right to terminate this agreement should SMCCC fail to submit statements or to pay royalty fees as herein provided by giving SMCCC sixty (60) days written notice of termination, which notice shall specify the default relied upon, in which event this agreement shall terminate sixty (60) days after the date of such notice; provided, however, that if during such sixty (60) day period SMCCC shall remedy such default, then such notice of termination shall be null and void.

IX.2   Either party may terminate this agreement in the event the other party:  (a) Fails to perform any of the material covenants or to carry out any of the material obligations hereunder by giving such other party sixty (60) days written notice of termination, which notice shall specify the default relied on, in which event this agreement shall terminate sixty (60) days after the date of such notice; provided, however, that if during such sixty (60) day period such other party shall remedy such default, then such notice of termination shall be null and void.  (b) Makes any assignment for the benefit of creditors or has any receiver appointed for or any execution levied on all or a substantial part of such other party's business or assets or has any voluntary or involuntary petition in bankruptcy filed for or against it, by giving such other party thirty (30) days written notice of termination, in which event this agreement shall terminate thirty (30) days after the date of such notice; (c) Is liquidated, terminated or dissolved, except where such liquidation, termination or dissolution is an incident of a merger or corporate reorganization in the ordinary course of business, by giving such other party written notice of termination, in which event this agreement shall terminate immediately.

10

IX.3   Upon termination of this agreement:  (a) If termination is the result of a default by SMCCC, Tres Tech may elect in writing to require SMCCC to reassign the HFV Patents and the HFV Technology to Tres Tech or its successor, and SMCCC will promptly reassign such HFV Patents and HFV Technology to Tres Tech; provided, however, that should SMCCC reassign the HFV Patents and the HFV Technology to Tres Tech, SMCCC will be permitted to sell or rent all equipment which is then in the form of finished goods or work in process upon the payment of the applicable royalty.

IX.4   Upon termination of this agreement:  (a) If termination is the result of a default by Tres Tech, SMCCC may elect in writing to require Tres Tech to reassign the HFV Patents and the HFV Technology to SMCCC or its successor, and Tres Tech shall promptly reassign such HFV Patents and HFV Technology to SMCCC; provided, however, that should Tres Tech reassign the HFV Patents and the HFV Technology to SMCCC, Tres Tech will be permitted to sell or rent all equipment which is in the form of finished goods or work in process.

## X.  MISCELLANEOUS PROVISIONS

X.1   ASSIGNMENT.  Neither this agreement nor any interest herein may be assigned, in whole or in part, by either party without the prior written consent of the other party, except that, without securing such prior consent, SMCCC may assign this agreement to any purchaser of substantially all of the business of SMCCC to which the subject matter hereof relates, provided such purchaser assumes in writing all obligations of SMCCC herein, and such purchaser is financially able to meet the financial obligations of this Agreement.

X.2   BINDING EFFECT.  This agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns.

X.3   CONSENT.  Whenever consent or approval of either party is required to permit the other party to proceed in any activity permitted under this agreement, such consent shall not be unreasonably withheld or delayed.

X.4   CONSTRUCTION.  This agreement shall be deemed to be made and entered into pursuant to the laws of the United States and the State of California and shall be interpreted and construed in accordance with the laws of the State of California.

11

X.5   PUBLICITY.  Except as may be required by applicable laws and regulations or a court of competent jurisdiction, or as required to meet credit and financing arrangements, or as required or appropriate in the reasonable judgment of either party to satisfy the disclosure requirements of any applicable securities law or regulation or any applicable accounting standard, neither party shall make any public release respecting this agreement and the terms hereof without the prior consent of the other party.

X.6   NOTICE.  All notices, statements and reports required or permitted by this agreement shall be in writing and deemed to have been effectively given and received five (5) days after the date of dispatch by certified or registered mail, postage prepaid, to the party to whom any such notice, statement or report is to be given, addressed as follows:

> For SMCCC:         SensorMedics Critical Care
>                             22705 Savi Ranch Parkway
>                             Yorba Linda, CA  92687
>                             Attention:  President
>
> For Tres Tech:      Tres Tech Corporation
>                             1201 Vassor Circle
>                             Plano, Texas  75075

Either party may change its address for the purpose of this paragraph by notice given pursuant to this paragraph.

X.7   FORCE MAJEURE.  Neither party shall be in default hereunder for any failure of or delays in performance resulting from causes beyond its control, such as acts of God or the public enemy; accidents; fire; explosion; acts of war including insurrection, revolution, riot or embargo; rights of third persons (other than those conferred or permitted to arise in contravention of the obligations of this agreement) established in actions at law or in equity, including injunctions, restraining orders and stays of all kinds; and statutory and governmental prohibitions, restrictions and/or regulations; provided that if any such cause exists for a period of six (6) consecutive months, the parties shall confer to determine whether and on what terms and condition to continue or terminate this agreement.

X.8   ARBITRATION.  The parties agree to use their best efforts to amicably resolve any dispute or disagreement which arises with regard to this agreement.  In the event any dispute or disagreement with respect to this Agreement arises which cannot be resolved amicably, or in the event the parties cannot agree as to the amount of royalty to be paid pursuant to this Agreement, then such dispute, disagreement or inability to agree shall be settled by arbitration conducted in

 12

accordance with the Rules of the American Arbitration Association.  The Arbitration shall be con-
ducted by a three-member panel pursuant to the Federal Arbitration Act and shall be binding.  The
Arbitration shall take place in Phoenix, Arizona and judgment upon the award rendered by the
arbiters may be entered in any court of competent jurisdiction.

X.9    SEVERABILITY.  This Agreement shall be construed and interpreted to avoid violat-
ing any applicable law.  If any part, segment, or clause of this Agreement is held illegal or unen-
forceable by any court of competent jurisdiction, such part, segment, or clause shall be deemed
separable from the remaining provisions of this Agreement and shall not affect or impair the valid-
ity or enforceability of the remaining provisions of this Agreement.  The parties direct the arbiters
and court which interprets this Agreement to reform it if needed to make the remaining portions of
the Agreement enforceable.

X.10   HEADINGS.  The headings of the several articles are inserted for convenience of
reference only and are not intended to be a part of or to affect the meaning or interpretations of
this agreement.

X.11   WAIVER.  The waiver of a default hereunder by one party may be effected only by
a written acknowledgment signed by the other party and shall not constitute a waiver of any other
default.  The failure of either party to enforce any right or remedy for one default shall not be
deemed a waiver of said right or remedy if the other party persists in such default or commits any
other default, nor shall such failure in any way affect the validity of this agreement or any part
hereof.

X.12   ENTIRE UNDERSTANDING.  This written instrument constitutes the entire under-
standing and agreement between the parties with respect to the subject matter hereof, integrates
all prior understandings and agreements with respect thereto, and shall not be varied, amended or
supplemented except in writing of even or subsequent date, executed by the parties.

13

IN WITNESS WHEREOF, the parties hereto have executed this agreement as of the day and year first above written.


SENSORMEDICS CRITICAL CARE CORPORATION

ATTEST:

*Donney Collier*

ATTEST:

TRES TECH CORPORATION

14



**SensorMedics**
**Critical Care**

November 22, 1995

Mr. Carl Strating
Tres Tech Corporation
3627 Granby Court
San Antonio, Texas   78217

Dear Carl:

Per your request I have deleted paragraph VI.6 from the Royalty Agreement.  I have enclosed two origi-
nally signed Royalty Agreement Contracts for your signature.  Please sign the Agreements and initial each
page of both and return both of the originally signed Agreements to me.  At present I am out of the office
but upon my return I will initial all pages and return one originally signed Agreement to you.

Sincerely,

*William B. Ross*

William B. Ross
President

WR:bc
Enclosure

APP.046
TT 04303

# EXHIBIT C

## AMERICAN ARBITRATION ASSOCIATION
### Commercial Arbitration Tribunal

TRES TECH CORPORATION,

Claimant and Counter-respondent,

v.

CAREFUSION CORPORATION,

Respondent and Counter-claimant.

Case No.: AAA 76 122 Y 00149 12 JENF

## AWARD OF ARBITRATOR

WE, THE UNDERSIGNED PANEL, having been designated in accordance with the arbitration agreement entered into between the above-named parties and dated July 1, 1995, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, do hereby, AWARD, as follows:

1.  The unanimous Panel finds that enforcement of the 1995 Royalty Agreement after 2006 is not patent misuse; and

2.  A majority of the Panel finds that the 1995 Royalty Agreement expires March 17, 2018.

   This arbitration was hard fought by counsel with skill and thoroughness. The Panel authorized significant discovery, received Pre-Hearing briefs on February 1, 2013, conducted a three-day evidentiary hearing on February 18, 19 and 20, 2013 and held several hours of closing argument in this case on February 20, 2013. The Panel then received Post-Hearing Briefs on March 8, 2013 and Post-Hearing Reply Briefs on March 15, 2013. This created a full and

1

detailed record from which the Panel has had a full opportunity to consider the issues raised and evidence presented in this proceeding.

During the Hearing, Tres Tech withdrew its allegation that the version of the 1995 Royalty Agreement marked as Joint Exhibit 1 was a forgery, and CareFusion stipulated that the 1995 Royalty Agreement at issue is the Joint Exhibit 2 version. This eliminated from the arbitration the issue of which version of the 1995 Royalty Agreement was the effective agreement. The Panel's decisions are based on the Joint Exhibit 2 1995 Royalty Agreement.

The following sets forth the Panel's reasons for the decisions stated above:

### Patent Misuse

CareFusion contends that the 1995 Royalty Agreement is unenforceable after April 18, 2006 when the last of the original patents in which Jensen was an inventor or a co-inventor ("the Jensen Patents") expired on the grounds that enforcement of the 1995 Royalty Agreement after that date would constitute patent misuse as a per se antitrust violation under the holding in Brulotte v. Thys Co., 379 U.S. 29 (1964) and subsequent cases, including Zila, Inc. v. Tinnell, 502 F.3d 1014 (9th Cir. 2007).

For the reasons discussed below, the Panel finds that under Brulotte and the related cases, enforcement of the 1995 Royalty Agreement after 2006 does not constitute patent misuse.

The gravamen of the cases under Brulotte is that a patent owner may not use the power of its patent monopoly to require a licensee to pay royalties or face patent restrictions after expiration of the licensed patents, and that any such requirement is unenforceable as a matter of patent misuse. In Brulotte, the Court concluded that, in view of the nature of the license agreement there, including post expiration use royalties and post expiration restrictions on transfer, "the Licensee was using the licenses to project its monopoly beyond the patent period."

2

(379 U.S. at 32). The Court said "We are, therefore, unable to conjecture what the bargaining position of the parties might have been and what resultant arrangement might have emerged had the provision for post-expiration royalties been divorced from the patent and nowise subject to its leverage." In short, Brulotte held that to use a patent's leverage to project royalty payments beyond the patent's life is improper.

While the Brulotte doctrine has been criticized (see, Scheiber v. Dolby Laboratories, Inc., 293 F.3d 1014 (7th Cir. 2002 )) and refined in a series of cases which recognize the tension between the parties' right to contract and antitrust policy, it remains good law for the basic principle, subject to caveats. See, e.g., Aronson v. Quick Point Pencil Co., 440 U.S. 257 (1979) (where the pending patent application at the time of the deal never matured into a patent there could be no patent leverage and there was no misuse).

A brief summary of the series of agreements which brought the parties to where they were in 1995 when the 1995 Royalty Agreement was executed is appropriate for consideration of this issue.

In 1984, Texas Research, Inc. ("TRI"), which had developed the basic high-frequency ventilator technology, entered into a Patent and Technology Transfer, Manufacturing and Marketing Agreement with Gould Inc. That agreement provided for the transfer to Gould of proprietary technical information, drawings, data and the like as well as certain pending patent applications, which later matured into the Jensen Patents. The 1984 Agreement was not a patent license per se, but a business agreement that provided TRI with the right to manufacture certain components of high-frequency ventilators for Gould, contained a non-compete provision by TRI, provided for consulting services by TRI and governed other business relations between the parties. It incorporated a specific agreed definition of "high-frequency ventilator" or "HFV" (see

3

paragraph 1. 3); defined the "HFV Technology" transferred to Gould which included technical know-how, trade secrets drawings and the like "whether or not patentable" (See paragraph 1.7); provided for certain upfront payments; and provided for a royalty based on the sales and rentals of HFV Equipment. The agreement provided that if the Equipment subject to royalty was not covered by one or more "Patent Claims" (a defined term not limited to the Jensen Patents) the applicable royalty would be cut in half.

Most importantly here, the agreement provided for the assignment to Gould and its successors of the entire right, title and interest in and to the HFV Patents, which involved the transfer to Gould of all of the then pending patent applications which would later mature into the Jensen Patents. The agreement was to continue until the expiration of those patents, or 21 years from the effective date, whichever was later.

There are other provisions in the 1984 Agreement which are not material to the issue of patent misuse, but are discussed later in connection with interpretation of the terms of the 1995 Royalty Agreement.

In 1987, Tres Tech acquired the assets of TRI, including the grantor side of the 1984 Agreement, and Sensormedics ultimately acquired the grantee side of the 1984 Agreement from Gould. The details of related bankruptcies and the sequence of acquisitions is not material to the issue now under discussion.

In 1989, Tres Tech (as successor to the TRI interest) and Sensormedics (ultimately "SMCCC") as successor to the Gould interest entered into a new Royalty Agreement which replaced the 1984 Agreement and provided for a royalty obligation for 21 years from the date of the 1989 Royalty Agreement. In effect, as relevant here, under the 1989 Royalty Agreement, SMCCC retained the Jensen Patents and the full rights to use the Jensen Patents until their

4

expiration. There are some confusing aspects to the 1989 Royalty Agreement, but neither party has challenged SMCCC's right to the Jensen Patents nor asserted any legal impropriety in the terms of the 1989 Royalty Agreement.

It is against this background that from May to November, 1995 Tres Tech and SMCCC negotiated what became the 1995 Royalty Agreement. The details of such negotiations were a substantial subject of the Hearing. Both the Tres Tech negotiator, Mr. Strating, and the SMCCC negotiator, Mr. Ross, testified extensively at the Hearing. What is clear from this testimony is that renegotiation of the 1989 Royalty Agreement was initiated by Mr. Ross on behalf of SMCCC for the purpose of altering the royalty structure under the 1989 Royalty Agreement and reducing SMCCC's royalty obligation going forward. Both negotiators agree that it was their intention to extend the period of the royalty obligation in consideration for a modification of the royalty structure and reduction of the royalty rate, which Mr. Ross felt would be highly advantageous to SMCCC.

In view of this history and background, and the positions of the parties at the time of the 1995 Royalty Agreement, CareFusion's arguments concerning the applicability of Brulotte and the related cases improperly rely on the simple assertion of what has been called "bright line" rules in some of the cases. CareFusion argues that the current case is substantially on all fours with the Zila case in the Ninth Circuit. Thus, CareFusion argues that since royalties in the 1995 Royalty Agreement extend beyond the expiration date of all of the Jensen Patents, and since the 1995 Royalty Agreement does not provide that the royalties will be reduced in 2006 at the time when the last of the Jensen Patents expired, the agreement constitutes a patent misuse.

The Panel does not agree.

5

First, unlike Brulotte and its progeny, the record establishes that in entering into the 1995 Royalty Agreement, Tres Tech did not, and indeed could not, have used leverage of the Jensen Patents to extract extended royalty payments from CareFusion after the expiration of those patents.  SMCCC already had the right to all of the Jensen Patents when it sought the revised royalty arrangement.  There is no dispute that SMCCC and its successors owned and could continue to use the Jensen Patents under the 1989 Royalty Agreement for the life of those patents.  By entering into the 1995 Royalty Agreement, SMCCC sought no new or additional rights to the Jensen Patents, and a desire to obtain rights in the Jensen Patents could have played no part in SMCCC's agreement to alter the royalty form and term.

Rather, the record establishes that the replacement of the 1989 Royalty Agreement with the 1995 Royalty Agreement was at SMCCC's urging for the purpose of reducing its royalty. Under the Scheiber case, if this was simply a new patent license the question of who suggested extending the royalty period might arguably not be relevant.  However, in the current circumstance, the existing situation of the parties at the time of the 1995 Royalty Agreement and the way in which the 1995 Royalty Agreement came about establishes that any modification of the basis for and extension of the term of royalties was not based on the Jensen Patents or any patent rights of Tres Tech.  Rather, this was an agreed contractual bargain, and nothing more. The mere existence of the Jensen Patents, then in SMCCC's hands and under its control, does not automatically convert this contractual bargain into a patent misuse.

Perhaps recognizing this, CareFusion's Post-Hearing Brief argues that the 1995 Royalty Agreement resulted from the leverage of the Jensen Patents, quoting Hearing Tr. at 389:25-390:15 (see CareFusion's Post-Hearing Brief at p. 10).  However, this portion of the record in no

way substantiates CareFusion's contention concerning coercion, and the record as a whole clearly establishes the opposite.

Second, the 1995 Royalty Agreement, extends the period during which royalties would be paid and does not reduce the royalty obligation "on expiration" of the Jensen Patents. However, this agreement does reduce the royalty obligation immediately on its execution, even before the Jensen Patents expire. The justification in cases relating to an initial license for approving an extended period of royalties, if the royalty is reduced upon expiration of the licensed patents, is that such a reduction demonstrates that the parties considered, and placed an appropriate value on, the non-patent elements of the transaction, thereby arguably establishing that the royalty obligation during the extension period was not based on the power of the underlying patents but was for other consideration. In the present case, an immediate reduction of the royalty rate even before the Jensen Patents expired under circumstances where the assignee (SMCCC) already had full rights to the Jensen Patents serves at least the same purpose as a reduced royalty on expiration. Indeed, it is an even stronger circumstance than where the patent owner was still in a position to withhold the basic patent rights for the patent term and could have used such rights to achieve a reduced royalty payment for an extended term after patent expiration.

The reference to patents in the 1995 Royalty Agreement was only used as a convenient marker of time. All of the patents were owned by SMCCC. SMCCC offered the bargain of exchanging a longer royalty period for a different royalty base and a lower royalty rate. The facts in the present case make it clear that the purpose of extending royalty payments at a reduced rate was not to acquire rights under the Jensen Patents, nor coerced by leverage of the Jensen Patents, but was for SMCCC's own business interest and purpose.

7

A dispute exists as to how much of a reduction in royalty the 1995 Royalty Agreement really represented over the 1989 Royalty Agreement. CareFusion argues that the royalty reduction was very modest on the grounds that "disposables" were already not royalty bearing, and the fixed amount per device was not that different from the prior royalty. Mr. Ross, who negotiated for SMCCC, testified credibly that the reduction was very significant to him and SMCCC in that the 5% royalty for rentals was reduced to 1%, the royalty on disposables (which Mr. Ross believes could be subject to royalty obligation) were eliminated, and the royalty payable was no longer based on the sale price which Mr. Ross testified he expected would increase. Mr. Ross testified that SMCCC saved $6M, a significant sum.

It is not for the Panel to evaluate the degree of ultimate saving by SMCCC as a result of the 1995 Royalty Agreement. Suffice it to say that Mr. Ross, the negotiator for SMCCC, believed it would constitute a significant royalty reduction as the HFV product went forward into more widespread production and use. Mr. Ross' perception is sufficient and is what motivated the transaction. Tres Tech's negotiator, Mr. Strating, thought the same. What is significant is that the parties viewed the altered royalty conditions requested by SMCCC as a reduction in prospective royalty obligations given in consideration for an extension of the royalty term, a business trade off unrelated to the seeking of a license under the Jensen Patents and not a patent misuse.

Third, while CareFusion argues that royalties paid after 2006 "are due entirely to patents and improvements made by CareFusion" (Post-Hearing Brief, p. 12), the payment of royalties under the 1995 Royalty Agreement is not tied to infringement of the Jensen Patents, CareFusion Patents, or any patents at all. The payments provided for in paragraph III of the 1995 Royalty Agreement provide a fixed fee for every High-Frequency Ventilator ("HFV") manufactured; a

8

1% royalty (down from 5%) on the net rental price generated from renting such ventilator; and other royalty obligations for the driver used for a certain purpose. Thus, principal payments depend on the definition of "HFV" which is defined in paragraph I.2. of the 1995 Royalty Agreement as the respirator originally developed by TRI in specific technical terms, namely a respirator which "generates a polarized, variable amplitude, variable frequency pressure wave and has a variable inspiration and expiration ratio and is used in respiratory support." This is the same concept used in the 1984 Agreement. It is not tied to any patent or patent claim. In the 1984 Agreement, royalties were paid on sales of "Equipment" which was defined as incorporating "HFV Technology." This royalty was reduced by 50% if not covered by one or more "Patent Claims," but "Patent Claims" were defined in such a way that they need not be claims of the Jensen Patents.

In the 1995 Royalty Agreement, the definition of "HFV Patents" (Para. I.3.) serves no purpose other than to establish a term for the royalty obligation. Royalties are not based on infringement of such patents. It would not be unreasonable for SMCCC to agree to a negotiated (and reduced) royalty for the original technology transfer during an extension period defined by the existence of one or more patents which could provide some competitive advantage to SMCCC, whether or not such patents were part of the original Jensen Patent family and irrespective of who the inventor was.

In this case, the record establishes that the royalty-bearing products, the 3100A and 3100B, are also covered by the Rautikus and Fox Patents since those patent numbers are marked on those products. This is not to say that royalties are due on infringement of those patents, but only that extending the term in exchange for a reduced royalty for a period during which SMCCC had patent coverage is not an unreasonable step.

9

APP.056

In addition, in striking the balance between the parties' freedom to contract and the public interest in the restrictions created by patents, the Court has suggested that the existence of a patent on the product diminishes or eliminates the public interest in creating per se restrictions, since the only issue is who owns the patent and what is paid between the parties, not the public's freedom to operate. Transparent-Wrap Machine Corp. v. Stokes & Smith Co., 329 U.S. 637 (1947). This also tends against the concept of patent misuse here because the public's freedom to operate has not been affected by the 1995 Royalty Agreement.

In summary then, Brulotte is intended to prevent a misuse of the power of a patent to obtain extended benefits, which has no application to the business deal which SMCCC requested and Tres Tech agreed to in the 1995 Royalty Agreement. As part of that business deal, the parties to that agreement agreed on a reduced royalty which took effect immediately, and which they believed was in their mutual best interests, knowing that SMCCC had full rights to the Jensen Patents in any case. That agreement was simply a negotiated business deal between those parties which does not have any adverse impact on the public interest and does not constitute patent misuse.

In its closing argument, CareFusion conceded that royalties were due through the term of the Rautikus Patent, which expired on April 1, 2012, unless extending the royalty obligation beyond 2006 constituted a patent misuse under Brulotte and related cases. Given the Panel's unanimous decision on patent misuse, the Panel initially finds that such royalties were due and owing under the terms of the 1995 Agreement at least until expiration of the Rautikus Patent on April 1, 2012.

10

## Expiration of the 1995 Royalty Agreement

This leaves as the remaining issue in dispute whether the 1995 Royalty Agreement expired in 2012 or whether the agreement continues and royalties are due thereafter.

Tres Teoh has now disclaimed any claim for a continuation of the 1995 Royalty Agreement based on other patents beyond the expiration of the Fox Patent on March 17, 2018. The issue for the Panel then is whether the 1995 Royalty Agreement expired on April 1, 2012 or expires on March 17, 2018.

On this issue, the controlling language is found in two paragraphs of the 1995 Royalty Agreement.

First, Paragraph II provides that the 1995 Royalty Agreement "will continue in force through the expiration of the last of the HFV Patents, unless sooner terminated as provided herein." As indicated previously, the HFV Patents and their expiration dates are essentially used in the 1995 Royalty Agreement only as a time marker to establish the expiration date of the Agreement.

"HFV Patents" are defined in Paragraph I.3 of the 1995 Royalty Agreement as follows:

> I.3    HFV PATENTS. The term "HFV Patents" shall mean the United States and foreign patents relating to high frequency ventilators which are owned by SMCCC subject to royalty and other obligations previously set forth in the Patent and Technology Transfer, Manufacturing and Marketing Agreement. These patents include U.S. Patent Nos. 4,719,910; 4,747,402; 4,805,612; 4,821,709; 5,307,794 as well as all patents which were the subject of the Patent and Technology Transfer, Manufacturing and Marketing Agreement.

11

The meaning of these two sentences controls the issue of whether the definition of HFV Patents does or does not include the Fox Patent, and has been a principal issue of dispute between the parties in this matter throughout the arbitration, at the Hearing and in the Post-Hearing Briefs.

The parties stipulated that the first four patent numbers specifically listed in the second sentence in the definition of "HFV Patents" are the Jensen Patents referred to previously in this Award. The fifth patent specifically listed in the second sentence is the Rautikus Patent discussed previously. The parties also stipulated that the only patents that were granted from the patent applications listed on Exhibit A of the 1984 Agreement, including any continuations, continuations-in-part, divisions, reissues or any other patent claiming priority to any such patent applications were the first four patents listed in the second sentence of Paragraph I.3, i.e. the Jensen Patents. As discussed previously, in view of the Panel's decision on patent misuse, the 1995 Royalty Agreement continued at least until the expiration of the Rautikus Patent, the fifth patent listed in the second sentence.

The principal dispute between the parties is whether the Fox Patent, U.S. Patent No. 6,085,746, which was filed March 17, 1998, issued on July 11, 2000 and expires on March 17, 2018 is an "HFV Patent" within the meaning of Paragraph I.3 of the 1995 Royalty Agreement. The parties agree that the Fox Patent is not listed in the definition of HFV Patents, and was not a patent transferred from TRI to Gould pursuant to the 1984 Agreement. These agreements set the stage for the issue of whether the Fox Patent is or is not an HFV Patent within the meaning of Paragraph I.3 of the 1995 Royalty Agreement. Again, if not, the Agreement expired at the expiration of the Rautikus Patent on April 1, 2012; if so, the Agreement will expire at the expiration of the Fox Patent on March 17, 2018.

12

The Fox Patent relates to an improved HFV apparatus which is similar to the initial Jensen apparatus but uses multiple magnets and a strengthened 'spider' mechanism in conjunction with its coil to increase the volume of gas flow with reduced noise. The increased gas flow substantially prevents overheating when an internal diaphragm is heavily driven, thus making this arrangement more suitable for use with larger patients, primarily adults. The commercial embodiment of the Fox structure is apparently the 3100B product design.

CareFusion argues that the Fox Patent does not meet the first sentence of the I.3 definition because it was not "owned by SMCCC subject to royalties and other obligations previously set forth" in the 1984 Agreement. CareFusion points out that the definition of "HFV Patents" in the 1984 Agreement (Section 1.5) are patents "owned by TRI" and resulting from the patent applications in Exhibit A attached to the 1984 Agreement. The Fox Patent was never owned by TRI and the invention of the Fox Patent was developed by CareFusion independently of Tres Tech or its predecessor TRI, indeed after the 1995 Royalty Agreement was executed.

CareFusion also argues that, while TRI assigned to Gould and its successors the "HFV Technology" as defined in the 1984 Agreement, the invention of the Fox Patent is not "HFV Technology" per se within the meaning of Paragraph 1.7 of the 1984 Agreement because the Fox invention was not owned by TRI on the effective date in 1984. While TRI also assigned to Gould and its successors "Improvements" in the 1984 Agreement, CareFusion argues that the Fox Patent invention is not an Improvement within the meaning of Section 1.8 of the 1984 Agreement because it was not developed by TRI or its successor Tres Tech, and the term "Improvement" is defined in the 1984 Agreement as any improvement or invention affecting high frequency ventilators which is "developed by TRI" after the effective date of the 1984 Agreement.

13

CareFusion argues that these provisions concerning "HFV Patents," "HFV Technology" and "Improvements" are the only provisions of the 1984 Agreement which could create "royalty and other obligations" under the 1984 Agreement as they read that language in the definition of HFV Patents in the first sentence of I.3 of the 1995 Royalty Agreement, and that the Fox Patent does not come under any of those obligations.

Finally, CareFusion argues that the Fox Patent does not meet the second sentence of the HFV Patent definition because it is not specifically listed in this sentence and the reference to "all patents which were the subject of" the 1984 Agreement does not include the Fox Patent invention as indicated above.

CareFusion argues that the language of I.3 is clear and that the Panel need not look to parol evidence to understand its meaning. They point to the integration clause in the 1995 Royalty Agreement, Par. X.12, and argue that what they view as the clear meaning of Par. I.3 must control.

Tres Tech, of course, takes a contrary view.

Tres Tech argues that the Fox Patent is not identified in the list of patents in the second sentence of paragraph I.3 only because it was not filed at the time the 1995 Royalty Agreement was executed. It argues that if the first sentence of the definition is read in the manner proposed by CareFusion, then the only patents referred to in the first sentence are, at most, the four Jensen Patents. It argues that when the second sentence says "These patents include . . ." and lists five patents, including the Rautikus Patent, this indicates that the parties intended that patents defined in the first sentence include more than the four Jensen Patents. Tres Tech, in effect, argues that the first sentence cannot be read as restrictively as CareFusion proposes because it provides no explanation for why the phrase "These patents include ...." is used with regard to the Rautikus

14

Patent if it is not one of the included patents in the first sentence. It argues that if CareFusion's analysis is accepted, then the only patents that meet the definition would be the Jensen Patents, and there would be no extension of the royalty period. Tres Tech argues that, in terms of what should be included in the first sentence, there is no distinction between the Rautikus Patent and the Fox Patent, except that the Rautikus Patent was already issued and is therefore listed, the Fox Patent was not yet filed and is, therefore, not listed.

Referring to the first sentence then, Tres Tech basically argues that the reference to patents related to high frequency ventilators that are "subject to royalty and other obligations" previously set forth in the 1984 Agreement was intended to take account of the fact that the royalty obligation under the 1984 Agreement is not tied to patents. They argue that the "royalty and other obligations" under the 1984 Agreement is contained in Paragraph 3.1 of that agreement which calls for royalties on "Equipment." "Equipment" is defined in Paragraph 1.14 of that Agreement as "apparatus or systems incorporating HFV Technology," with HFV Technology broadly encompassing the technology from TRI to Gould "whether or not patentable." The argument is that patents "subject to royalty and other obligations" means patents that cover, or in patent terms that claim, subject matter which would be subject to such obligations. In effect, Tres Tech argues that while the asserted inventive improvement of the Rautikus and Fox Patents may not meet the definition of Improvements in the 1984 Agreement, the inventions covered by the Rautikus and Fox Patents and any product under those patents would have been "subject to royalty and other obligations under the 1984 Agreement" since the patents require use of the basic HFV Technology provided by TRI. Thus, Tres Tech reads the first sentence as including patents on inventions which require the HFV Technology of TRI.

15

Tres Tech further argues that both Mr. Strating on behalf of Tres Tech and Mr. Ross, the negotiator on behalf of SMCCC, testified that they intended the broader meaning of HFV Patents and that other evidence supports this interpretation. Tres Tech argues that the language of Par. I.3 clearly has the meaning they ascribe to it.

The Panel has considered both sides' positions in great detail.

First, the Panel notes that the 1995 Royalty Agreement, in spite of it being drafted and revised over a period of six months, is not drafted with the care and attention that might normally be expected in an agreement of this sort. There are definitions in the agreement which are not used in the substantive provisions, there are confusing disconnects among the terms used in the agreement, and other factors that leave the agreement less than clear in many respects. The most significant among these for present purposes is in the issue in the paragraph under discussion, namely the confusion caused by the inclusion of the Rautikus Patent in language that suggests that it is one of the patents generally referred to in the first sentence ("These patents include . . .").

There has been the suggestion that Rautikus may have been added by mistake, but there is insufficient evidence to support such suggestion. There is the possibility that Rautikus was added with the intention that it be the only patent included in addition to the Jensen Patents, but the language of Paragraph I.3 does not support this suggestion and the testimony of both negotiators contradict the position that the parties intended to add only one specific patent to the exclusion of any others.

The Panel has looked to other terms of the 1995 Royalty Agreement to see if this confusion is resolved by the application of other provisions. For example, there has been discussion of Paragraph VII on Improvements indicating, for example, that in VII.3 (added

16

during the negotiations of the 1995 Royalty Agreement) there is a specific provision providing

that "improvement by SMCCC in the HFV Patents or HFV Technology" will constitute

Equipment (either Category 1 Equipment or Category 2 Equipment) and would be royalty

bearing under the 1995 Royalty Agreement. Tres Tech argues that since Paragraph VII.3

contemplated royalties on SMCCC improvements and new patents, this suggests that it was the

intention of the parties that the agreement continue to include such patents to further extend its

term. While the Panel understands Tres Tech's argument, it is not definitive on this issue as to

the term "HFV Patents" as defined in Par. I.3.

On balance, a majority of the Panel finds that the definition of "HFV Patents" in I.3 is

ambiguous. Such ambiguity which is not clarified sufficiently by other terms of the agreement

brings into play parol evidence in spite of the integration clause, including the negotiation history

of the 1995 Royalty Agreement and whatever such negotiation establishes about the intent of the

parties. The Panel thus has considered the parol evidence.

Parol evidence in this case has been provided primarily by the direct testimony and cross-

examination testimony of the two negotiators who negotiated the 1995 Royalty Agreement and

by the drafting history of the agreement which helps provide instruction as to what the parties

intended.

Testimony on behalf of the Tres Tech side of the negotiation was provided by Mr.

Strating who, of course, has a significant financial interest in the outcome of this proceeding and

whose memory was vague. It was also provided by Mr. Ross, no longer associated with either of

the companies, who negotiated on behalf of SMCCC. Mr. Ross had no interest in the outcome of

the proceeding, although he was called as a witness by Tres Tech and concedes a friendship with

Mr. Strating. There was also testimony that Mr. Ross is currently in negotiations with

17

CareFusion concerning a dental business venture with which he is involved and for which CareFusion is a supplier, and that his interests may be adversely impacted to the extent that his testimony was contrary to the interests of CareFusion.

While the 1995 Royalty Agreement, in the last Whereas clause on page 1, indicates that the agreement "supersedes and replaces the previous agreements," it expressly indicates (as the 1989 Royalty Agreement did not) that that replacement is "except as provided herein." As indicated above, Paragraph I.3 refers to the 1984 Agreement. Surprisingly, both Mr. Strating and Mr. Ross, at the time of their testimony in this proceeding, seemed unclear about the terms and conditions of the 1984 Agreement. Both testified that at the time of the negotiations of the 1995 Royalty Agreement, and in spite of the reference to the 1984 Agreement in the paragraph now crucial to the remaining issue in this Arbitration, neither of them was familiar with the 1984 Agreement. This suggests that neither party intended a close reading of the 1984 Agreement and that such close reading is not likely to clarify the parties' intentions. Indeed, if the 1984 Agreement was read closely, one could argue that some of the Jensen Patents were not to be included since the definition of HFV Patents in the 1984 Agreement literally does not refer to possible continuations in part of the original applications.

Looking to the parol evidence, both Mr. Strating and Mr. Ross testified that it was their intention in entering into the 1995 Royalty Agreement that, by extending the term of the agreement for the life of "HFV Patents," they intended to include in HFV Patents improvement patents by either party which relied on the underlying HFV Technology created by TRI. A question has been raised as to how Mr. Ross could have intended to leave the term of the 1995 Royalty Agreement so open ended. The answer that comes out of the testimony is that he never expected the basic HFV Technology to survive and thrive as long as it has, and was willing to let

18

it continue on an open-ended basis as long as he reduced his company's royalty obligations -- achieving that reduction was his goal.

It is rare in the Panel's experience to have direct testimony from the negotiators for both sides of an agreement in virtually complete agreement as to their intention. As indicated previously, both negotiators appear to have taken a broad view of the meaning of patents relating to high frequency ventilators which are "subject to royalty and other obligations previously set forth" in the 1984 Agreement, confirming the Tres Tech reading of Par. I.3. Their testimony suggests a belief that patents subject to royalties or obligations included not merely the original applications, but patented subject matter which would have been subject to royalties or other obligations under the broad payment obligations of the 1984 Agreement because they were directed to the high frequency ventilators of TRI.

The development of the 1995 Royalty Agreement over the six months of negotiations also gives support to Tres Tech's interpretation of Par. I.3. For example, a prior draft of the agreement, previously before the Panel as Joint Exhibit 1, contains a specific provision in Par. II limiting the term of the agreement to "seventeen (17) years from May 1994" the anticipated expiration of the Rautikus Patent. If the parties meant to terminate the agreement on expiration of the Rautikus Patent, they could have left that explicit language and not made the changes contained in the final version of the 1995 Royalty Agreement.

In addition, CareFusion points out that in an initial draft of the Agreement provided to Tres Tech (Joint Exhibit 51), SMCCC proposed that the agreement remain in force for 21 years from its initial date, i.e., to a date in 2016. Why would Tres Tech in the final version of the agreement trade an expiration offered for 2016 for an expiration based on the Rautikus Patent which expired in 2012?

19

The broader interpretation of Par. I.3 is also consistent with the concept initially proposed by SMCCC at the time they first raised the subject of revising the 1989 Agreement. The argument made was that reducing the royalty would open the door to SMCCC further developing new and improved technology which would enhance and extend the prospects for the technology. While not explicitly tied to an extension of the term, this proposal does support an understanding on Tres Tech's part that Tres Tech would benefit by such improvement and extension based on the extended technology. One of those areas of extended technology is the adult application inherent in the Fox Patent.

On balance, a majority of the Panel finds it appropriate to give effect to the intention of the parties at the time of the 1995 Royalty Agreement based on the credible evidence admitted at the Hearing and to include the Fox Patent in the definition of HFV Patents in Paragraph I.3 so that the agreement expires March 17, 2018. The Panel also accepts Tres Tech's undertaking that it will not seek any further extension of the term beyond the expiration of the Fox Patent.

Based upon the analysis of the evidence and the arguments submitted by the parties, and upon our evaluation of the credibility of the witnesses' testimony, the Panel determines:

1.     Unanimously, that enforcement of the 1995 Royalty Agreement after 2006 does not constitute patent misuse and CareFusion's counterclaim is DENIED.

2.     By majority, that the term of the 1995 Royalty Agreement expires at the expiration of the Fox Patent on March 17, 2018 and royalties pursuant to the terms of the 1995 Royalty Agreement are due pursuant to the Agreement's terms until that date.

3.     Unanimously, that the Parties' crossclaims for counsel fees be, and the same hereby are DENIED, and each party shall bear its own attorneys fees and costs.

20

APP.067

4.    The administrative filing and case service fees of the AAA, totaling $20,150.00, shall be borne equally.  The fees and expenses of the arbitrators, totaling $176,290.69, shall be borne equally.  Therefore, Tres Tech Corporation shall reimburse CareFusion Corporation the sum of $1,374.99, representing that portion of said fees and expenses in excess of the apportioned costs previously incurred by CareFusion Corporation.

This Award is in full settlement of all claims and counterclaims submitted in this arbitration.  All claims not expressly granted herein are hereby DENIED.

This Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument as in the attached.

4/12/13
_____
Date

_____
Daniel Ebenstein, Chair

_____
Date

_____
Peter Michaelson

_____
Date

_____
James J. Kozuch

21

APR-12-2013  16:12        AMSTER ROTHSTEIN EBENSTIE              1 212 336 6001    P.023

I, Daniel Ebenstein, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

4/12/13
_____                    _____
Date                                         Daniel Ebenstein, Chair

I, Peter Michaelson, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

_____                    _____
Date                                         Peter Michaelson

I, James J. Kozuch, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

_____                    _____
Date                                         James J. Kozuch

TOTAL P.023

APP.069

4.      The administrative filing and case service fees of the AAA, totaling $20,150.00, shall be borne equally. The fees and expenses of the arbitrators, totaling $176,290.69, shall be borne equally. Therefore, Tres Tech Corporation shall reimburse CareFusion Corporation the sum of $1,374.99, representing that portion of said fees and expenses in excess of the apportioned costs previously incurred by CareFusion Corporation.

This Award is in full settlement of all claims and counterclaims submitted in this arbitration. All claims not expressly granted herein are hereby DENIED.

This Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument as in the attached.

_____                    _____
Date                                        Daniel Ebenstein, Chair


_____                    _____
Date                                        Peter Michaelson

_____                    _____
Date  4/12/2013                             James J. Kozuch

I, Daniel Ebenstein, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.


_____          — _____
          Date                              Daniel Ebenstein, Chair


I, Peter Michaelson, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.


_____          _____
          Date                              Peter Michaelson


I, James J. Kozuch, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.


4/12/2013                        _____
    Date                              James J. Kozuch

APP.071

4.    The administrative filing and case service fees of the AAA, totaling $20,150.00, shall be borne equally. The fees and expenses of the arbitrators, totaling $176,290.69, shall be borne equally. Therefore, Tres Tech Corporation shall reimburse CareFusion Corporation the sum of $1,374.99, representing that portion of said fees and expenses in excess of the apportioned costs previously incurred by CareFusion Corporation.

This Award is in full settlement of all claims and counterclaims submitted in this arbitration. All claims not expressly granted herein are hereby DENIED.

This Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument as in the attached.

| | |
|---|---|
| _____ | _____ |
| Date | Daniel Ebenstein, Chair |
| _April 13, 2013_ | _Peter Michaelson_ |
| Date | Peter Michaelson |
| _____ | _____ |
| Date | James J. Kozuch |

21

I, Daniel Ebenstein, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

_____          _____
Date                                            Daniel Ebenstein, Chair

I, Peter Michaelson, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

April 13, 2013                         _____
_____          Peter Michaelson
Date

I, James J. Kozuch, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

_____          _____
Date                                            James J. Kozuch

22

APP.073

# EXHIBIT D

KEVIN W. ALEXANDER
KALEXANDER@GORDONREES.COM

# GORDON & REES LLP

ATTORNEYS AT LAW
101 W. BROADWAY
SUITE 2000
SAN DIEGO, CA 92101
(619) 696-6700
(619) 696-7124
WWW.GORDONREES.COM

June 19, 2012

<u>VIA OVERNIGHT MAIL</u>          <u>CONFIDENTIAL SETTLEMENT COMMUNICATION</u>
Philip D. Freeman
Winstead PC
Bank of America Plaza
300 Convent, Suite 2700
San Antonio, TX 78205

Re:    <u>Tres Tech Corporation / CareFusion Corporation</u>

Dear Mr. Freeman:

Enclosed is a check from CareFusion Corporation ("CareFusion"), check no. 233206, in the amount of $597,244.00, along with documentation supporting the calculation of this amount. The enclosed check constitutes CareFusion's full payment of all remaining obligations due to Tres Tech under the 1995 Royalty Agreement, which Agreement has now expired.

As previously mentioned, the enclosed payment and supporting documentation should not be interpreted as a waiver of any of CareFusion's rights pursuant to the 1995 Royalty Agreement or otherwise. CareFusion reserves all rights.

Please do not hesitate to contact me if you have any questions.

Very truly yours,

GORDON & REES LLP

Kevin W. Alexander

Enclosures

CARBF/1074983/12792555v.1

CALIFORNIA ♦ NEW YORK ♦ TEXAS ♦ ILLINOIS ♦ NEVADA ♦ ARIZONA ♦ COLORADO
WASHINGTON ♦ OREGON ♦ NEW JERSEY ♦ FLORIDA ♦ GEORGIA ♦ CONNECTICUT

 **CareFusion**  CareFusion — VIASYS — RESP
4100 Osuna Road NE, Ste 2N
Albuquerque, NM 87109
Telephone 866.612.7200



000 0000227 00000000 001 001 00214 INS: 00
TRES TECH CORP
2607 BUNKER HILL
MC KINNEY, TX 75070

Page 1 of 1

| VOUCHER NO. | INVOICE NO. | PURCHASE ORDER NO. | GROSS AMOUNT | DISCOUNT AMOUNT | NET AMOUNT |
|---|---|---|---|---|---|
| M*22587 | 061112597244 | | 597,244.00 | 0.00 | 597,244.00 |
| | | | | | |

| CHECK NUMBER | DATE | VENDOR NO. | NAME | TOTAL AMOUNT |
|---|---|---|---|---|
| 233206 | 06/13/12 | | TRES TECH CORP | $ 597,244.00 |

CN2071 v.0.01 02.05.10

---

**CareFusion** — VIASYS — RESP
4100 Osuna Road NE, Ste 2N
Albuquerque, NM 87109
Telephone 866.612.7200

CHECK NO.
233206

62-153
112

DATE OF CHECK
06/13/12

PAY ***FIVE HUNDRED NINETY SEVEN THOUSAND TWO HUNDRED FORTY
FOUR AND 00/100***

VOID AFTER 90 DAYS

TO ORDER OF:    TRES TECH CORP
2607 BUNKER HILL
MC KINNEY, TX 75070

CHECK AMOUNT
USD   ***$597,244.00

Bank of America

Authorized Signature

⑆0000233206⑆ ⑈011201539⑈ 0022000217⑈

**TOTAL**

| | | | | | | | (1) | (2) | |
|---|---|---|---|---|---|---|---|---|---|
| **Date** | **PN Desc** | **Quantity** | **Amount** | **Build QTY** | **Rental QTY** | **RENTAL $** | **Build Royalty** | **Rental Royalty** | **TOTAL ROYALTY** |
| Jun '11 thru Mar '12 | 3100A RENTAL | 1,269 | 2,344,690 | 546 | 1,835 | 3,124,368 | 600,600 | 31,244 | 631,844 |
| | 3100B RENTAL | 566 | 779,678 | | | | | | |
| | Total | 1,835 | 3,124,368 | | | | | | |

Total Royalty Calculation: 6/1/11 - 3/31/12

| | |
|---|---|
| Build Discount - Q1 | $ (9,800) |
| Build Discount - Q2 | $ (21,600) |
| Build Discount - Q3 | $ (3,200) |
| | |
| Total Royalty Accrual: | $ 597,244 |

(1)   Build Quantity * $1,100
(2)   Rental Revenue * 1%

**P12 FY11**

Royalty Calculation: 6/1/11 - 6/25/11

| | | | | | | | (1) | (2) | |
|---|---|---|---|---|---|---|---|---|---|
| **Date** | **PN Desc** | **Quantity** | **Amount** | **Build QTY** | **Rental QTY** | **RENTAL $** | **Build Royalty** | **Rental Royalty** | **TOTAL ROYALTY** |
| Jun '11 | 3100A RENTAL | 130 | 264,990 | 58 | 183 | 354,458 | 63,800 | 3,545 | 67,345 |
| | 3100B RENTAL | 53 | 89,468 | | | | | | |
| | Total | 183 | 354,458 | | | | | | |

| | |
|---|---|
| Jun Royalty Accrual: | $ 67,345 |

ROYALTY DUE FOR THE MONTH JUN '11   $   67,345

**QUARTER 1**

**P01 FY12**

**Royalty Calculation: 6/26/11 - 7/23/11**

| Date | PN Desc | Quantity | Amount | Build QTY | Rental QTY | RENTAL $ | (1) Build Royalty | (2) Rental Royalty | TOTAL ROYALTY |
|------|---------|----------|--------|-----------|------------|----------|-------------------|--------------------|----------------|
| Jul '11 | 3100A RENTAL | 93 | 155,880 | 33 | 137 | 222,210 | 36,300 | 2,222 | 38,522 |
|  | 3100B RENTAL | 44 | 66,330 |  |  |  |  |  |  |
|  | Total | 137 | 222,210 |  |  | Jul Royalty Accrual: | $ |  | 38,522 |

**P02 FY12**

**Royalty Calculation: 7/24/11 - 8/20/11**

| Date | PN Desc | Quantity | Amount | Build QTY | Rental QTY | RENTAL $ | (1) Build Royalty | (2) Rental Royalty | TOTAL ROYALTY |
|------|---------|----------|--------|-----------|------------|----------|-------------------|--------------------|----------------|
| Aug '11 | 3100A RENTAL | 115 | 225,900 | 52 | 160 | 284,340 | 57,200 | 2,843 | 60,043 |
|  | 3100B RENTAL | 45 | 68,440 |  |  |  |  |  |  |
|  | Total | 160 | 284,340 |  |  | Aug Royalty Accrual: | $ |  | 60,043 |

**P03 FY12**

**Royalty Calculation: 8/21/11 - 9/24/11**

| Date | PN Desc | Quantity | Amount | Build QTY | Rental QTY | RENTAL $ | (1) Build Royalty | (2) Rental Royalty | TOTAL ROYALTY |
|------|---------|----------|--------|-----------|------------|----------|-------------------|--------------------|----------------|
| Sep '11 | 3100A RENTAL | 135 | 248,520 | 69 | 188 | 327,240 | 75,900 | 3,272 | 79,172 |
|  | 3100B RENTAL | 53 | 78,720 |  |  |  |  |  |  |
|  | Total | 188 | 327,240 |  |  | Sep Royalty Accrual: | $ |  | 79,172 |

Qtr end Grand Total

| Total Units Built | 154 |  |  |
|-------------------|-----|--|--|
| -$100 per unit for 91 thru 120 | | 30 | $ (3,000) |
| -$200 per unit >120 | | 34 | $ (6,800) |
| Q1 Royalty Discount: | | $ | (9,800) |

**ROYALTY DUE FOR THE QUARTER JUL '11 - SEP '11:  $    167,938**

**QUARTER 2**

**P04 FY12**

**Royalty Calculation: 9/25/11 - 10/22/11**

| Date | PN Desc | Quantity | Amount | Build QTY | Rental QTY | RENTAL $ | (1) Build Royalty | (2) Rental Royalty | TOTAL ROYALTY |
|---|---|---|---|---|---|---|---|---|---|
| Oct-11 | 3100A RENTAL | 123 | 234,000 | 59 | 166 | 290,760 | 64,900 | 2,908 | 67,808 |
| | 3100B RENTAL | 43 | 56,760 | | | | | | |
| | Total | 166 | 290,760 | | | | Oct Royalty Accrual: $ | | 67,808 |

**P05 FY12**

**Royalty Calculation: 10/23/11 - 11/19/11**

| Date | PN Desc | Quantity | Amount | Build QTY | Rental QTY | RENTAL $ | (1) Build Royalty | (2) Rental Royalty | TOTAL ROYALTY |
|---|---|---|---|---|---|---|---|---|---|
| Nov-11 | 3100A RENTAL | 127 | 225,010 | 60 | 187 | 307,810 | 66,000 | 3,078 | 69,078 |
| | 3100B RENTAL | 60 | 82,800 | | | | | | |
| | Total | 187 | 307,810 | | | | Nov Royalty Accrual: $ | | 69,078 |

**P06 FY12**

**Royalty Calculation: 11/20/11 - 12/24/11**

| Date | PN Desc | Quantity | Amount | Build QTY | Rental QTY | RENTAL $ | (1) Build Royalty | (2) Rental Royalty | TOTAL ROYALTY |
|---|---|---|---|---|---|---|---|---|---|
| Dec-11 | 3100A RENTAL | 150 | 278,150 | 94 | 223 | 386,060 | 103,400 | 3,861 | 107,261 |
| | 3100B RENTAL | 73 | 107,910 | | | | | | |
| | Total | 223 | 386,060 | | | | Dec Royalty Accrual: $ | | 107,261 |

**Qtr end Grand Total**

| | | |
|---|---|---|
| Total Units Built | 213 | |
| -$100 per unit for 91 thru 120 | 30 | $ (3,000) |
| -$200 per unit >120 | 93 | $ (18,600) |
| Q2 Royalty Discount: | | $ (21,600) |

**ROYALTY DUE FOR THE QUARTER OCT '11 - DEC '11:  $      222,546**

**QUARTER 3**

**P07 FY12**

| | | | | Royalty Calculation: 12/25/11 - 1/21/12 | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Date | PN Desc | Quantity | Amount | Build QTY | Rental QTY | RENTAL $ | (1) Build Royalty | (2) Rental Royalty | TOTAL ROYALTY |
| Jan '12 | 3100A RENTAL | 43 | 265,600 | 12 | 206 | 346,860 | 13,200 | 3,469 | 16,669 |
| | 3100B RENTAL | 63 | 81,260 | | | | | | |
| | Total | 206 | 346,860 | | | | Jan Royalty Accrual: $ | | 16,669 |

**P08 FY12**

| | | | | Royalty Calculation: 1/22/12 - 2/18/12 | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Date | PN Desc | Quantity | Amount | Build QTY | Rental QTY | RENTAL $ | (1) Build Royalty | (2) Rental Royalty | TOTAL ROYALTY |
| Feb '12 | 3100A RENTAL | 127 | 204,400 | 31 | 188 | 271,650 | 34,100 | 2,717 | 36,817 |
| | 3100B RENTAL | 61 | 67,250 | | | | | | |
| | Total | 188 | 271,650 | | | | Feb Royalty Accrual: $ | | 36,817 |

**P09 FY12**

| | | | | Royalty Calculation: 2/19/12 - 3/31/12 | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Date | PN Desc | Quantity | Amount | Build QTY | Rental QTY | RENTAL $ | (1) Build Royalty | (2) Rental Royalty | TOTAL ROYALTY |
| Mar '12 | 3100A RENTAL | 126 | 242,240 | 78 | 197 | 332,980 | 85,800 | 3,330 | 89,130 |
| | 3100B RENTAL | 71 | 90,740 | | | | | | |
| | Total | 197 | 332,980 | | | | Mar Royalty Accrual: $ | | 89,130 |

Qtr end Grand Total

| | | |
|---|---|---|
| Total Units Built | 121 | |
| -$100 per unit for 91 thru 120 | 30 | $ (3,000) |
| -$200 per unit >120 | 1 | $ (200) |
| Q3 Royalty Discount: | | $ (3,200) |

ROYALTY DUE FOR THE QUARTER JAN '12 - MAR '12: $     139,415

# EXHIBIT E

AAA NO. _____

| | | |
|---|---|---|
| TRES TECH CORPORATION, | § | |
| | § | |
| Claimant | § | |
| | § | |
| v. | § | AMERICAN ARBITRATION |
| | § | ASSOCIATION |
| CAREFUSION CORPORATION, | § | |
| | § | |
| Respondent. | § | |

## CLAIMANT'S DEMAND FOR ARBITRATION

Tres Tech Corporation (hereinafter "Claimant" or "Tres Tech"), hereby makes a Demand for Arbitration complaining of CareFusion Corporation (hereinafter "Respondent" or "CareFusion"). Claimant has set forth the specifics of the Demand below and respectfully shows the following:

I.

## BASIS FOR INITIATING THIS ARBITRATION

1.        This dispute arises out of a Royalty Agreement dated July 1, 1995 ("the Royalty Agreement," a true and correct copy of which is attached hereto as Ex. A) between Claimant and Respondent's predecessor-in-interest. The Royalty Agreement contains a provision (Section X.8) requiring binding arbitration to be conducted in accordance with the Rules of the American Arbitration Association, by a three member panel in Phoenix, Arizona. The sole issue in the instant dispute relates to the term of the Royalty Agreement (Section II).  Whereas, Claimant believes that the Royalty Agreement is valid and subsisting, it is Respondent's position that the Royalty Agreement has expired.

APP.082

II.

## ARBITRATION LEVEL

2.        In this action, Claimant seeks to recover monetary damages in excess of $597,244.00, an accounting of the average sales prices of all sales and rentals of products by CareFusion involving HFV technology, a declaration that the Royalty Agreement continues in full force and effect as demonstrated below, and reimbursement of its attorneys' fees, costs, and interest and such other relief as the arbitrators may deem appropriate.

III.

## PARTIES

3.        Claimant is a privately held Texas corporation with its principal place of business in McKinney, Texas. Claimant is a research and development company that invented the High Frequency Oscillating Ventilator. The machine was used initially for the rescue of premature babies born with Hyaline membrane disease. This machine allows breathing at several times the normal ventilation rate, so that the lungs can remain static, thereby permitting the newborn to produce surfactant to give their lungs the plasticity to expand and contract without ripping open, as has been known to happen with conventional ventilation.  Over time, uses expanded to cover pediatric applications for treating children suffering from emphysema, asthma and smoke inhalation. The protocol was also expanded to adults suffering from asthma, emphysema, Acute Respiratory Distress Syndrome (ARDS) and smoke inhalation. Additional uses were developed for the administration of operating room anesthesia, and in emergency vehicles to save drowning victims by rapidly administering oxygen to the brain while aspirating the water from the lungs. Testing was also done to adjust the positive and negative pressures to create conventional ventilation in addition to oscillating ventilation in a single machine.  The

number of human lives that have been saved as a result of Claimant's technology cannot be overstated.

4.     Respondent is a California corporation with its principal place of business in San Diego, California, and is the successor in interest to SensorMedics Critical Care Corporation ("SensorMedics"), a signatory to the Royalty Agreement. Respondent is a NYSE (CFN) global, medical technology corporation serving the health care industry and employs 12,000 people worldwide. Respondent specializes in two areas of medical practice: reducing medication errors and prevention of health care-associated infections. Respondent manufactures health care technologies including IV pumps, automated dispensing and patient identification systems, ventilators, surgical instruments, and diagnostic products.

## IV.

## CONDITIONS PRECEDENT

5.     All conditions precedent necessary to maintain this action have occurred.

## V.

## NATURE OF THE DISPUTE

6.     This is a dispute regarding Claimant's right to be paid certain royalties relating sales and rentals relating to "High Frequency Ventilator" or "HFV" products involving High Frequency Oscillation Ventilator technology. The HFV ventilator was developed by Texas Research Incorporated primarily for use in respiratory support. Under the Royalty Agreement entered into between Claimant and SensorMedics (Respondent's predecessor-in-interest), SensorMedics agreed to make royalty payments to Claimant until "the expiration of the last of the HFV Patents". Contrary to the terms of the Royalty Agreement, Respondent, a successor-in-interest to SensorMedics, has refused to honor the terms of the Royalty Agreement and continues to refuse to pay Claimant unconditionally in accordance with the Royalty Agreement.

DEMAND FOR ARBITRATION– Page 3

VI.

RELEVANT FACTS AND SUPPORTING EVIDENCE

7.       In the early 1980s, Texas Research Incorporated ("TRI") developed a high frequency ventilator product ("HFV") for use in the treatment of humans and animals.  TRI and Gould, Inc. ("Gould") subsequently entered into that certain Patent and Technology Transfer, Manufacturing and Marketing Agreement as of November 30, 1984 an agreement ("Gould Agreement", a true and correct copy of which is attached hereto as Ex. B), whereby TRI would manufacture and market a veterinary version of its HFV product on behalf of Gould. As part of this agreement, TRI also assigned its right, title and interest in several patent applications (and patents issuing therefrom) on the HFV machine ("HFV patents") to Gould.  In 1987, Claimant acquired the assets of TRI including the Gould Agreement.

8.       In 1987, SensorMedics Corp. ("SMC") bought a division of Spectramed Cardiopulmonary, Inc. ("Spectramed"), Gould's successor-in-interest, as part of a management buyout of the medical products division of Gould.  In that acquisition, SMC assumed Gould's obligations under the Gould Agreement.   In 1989, SMC renegotiated the terms of the Gould Agreement with Claimant.

9.       In 1994, SMC created a company, SensorMedics, which was specifically focused on the development, FDA approval, and distribution of HFV machines.  SensorMedics is the predecessor-in-interest to Respondent.

10.      SMC created a product development and marketing strategy to produce a relatively high priced product (higher than any ventilator circuit at the time) and a rental strategy for HFV products, which it believed was required at the time to successfully introduce the new HFV technology to the market.  Under the existing agreement with Claimant, SensorMedics was required to pay a 5% revenue royalty to Claimant which according to SensorMedics, was

DEMAND FOR ARBITRATION– Page 4

APP.085

increasing the already high cost of the HFV products and preventing market penetration. In 1995, SensorMedics indicated to Claimant that (i) it was important to renegotiate the terms of the existing license agreement with Claimant, in order to reduce the cost of sales of the consumable HFV products, and (ii) certain patents that SensorMedics was developing at the time would extend the life of the Royalty Agreement with Claimant. SensorMedics' renegotiation of its agreement with Claimant in 1995, was done primarily with the intention of lowering the 5% revenue royalty being paid to Claimant. Pursuant to discussions between SensorMedics' President, William B. Ross, ("Ross"), and Claimant's General Manager, Carl Strating ("Strating"), SensorMedics and Claimant executed the Royalty Agreement. Thereafter, Respondent became successor-in-interest to SensorMedics.

11.     If one were to calculate the royalty fee that Claimant gave up in the 1995 renegotiation that led to the execution of the Royalty Agreement, it would equal several million dollars. Although the HFV has become a standard of care in current medical practice, at the time of its introduction to the market, HFV was a new modality with significant risk as to market adoption. Thus, Claimant's willingness to eliminate the 5% royalty fee as provided for under the terms of the earlier agreement between Claimant and SensorMedics in exchange for a longer termed contract, which in turn led to the execution of the Royalty Agreement, was a key factor that enabled Respondent to enjoy major success with the HFV technology.

12.     Recently, a controversy has arisen between Respondent (as SensorMedics' successor-in-interest) and Claimant regarding their respective interpretations of the Royalty Agreement. Respondent takes the position that Claimant is entitled to be paid a royalty only for those HFV patents that were "listed" in Section 1.3 of the Royalty Agreement. All of the "listed" patents have now expired. On the other hand, Claimant believes that under the Royalty

APP.086

Agreement, it is entitled to receive royalty on all HFV patents "which are owned by [SensorMedics]...." This understanding of the Royalty Agreement is clearly supported by the fact that during the renegotiation of the contract with Claimant, SensorMedics' president specifically pointed to "multiple market applications" that would strengthen the SensorMedics product line and result in a "bigger pay-off" for Claimant, if Claimant agreed to a reduced royalty agreement. *See* Letter from William Ross ("Ross")[1] to Carl Stating dated May 1995, a true and correct copy of which is attached hereto as Ex. C.

13.     Thus, it is clear that SensorMedics, Respondent's predecessor-in-interest, and Claimant fully intended for the Royalty Agreement to extend for the life of all SensorMedics HFV patents, including patents covering the market applications referenced in the May 1995 letter.     Ross had verbally notified Tres Tech of U.S. Pat. No. 6,085,746 ("the Fox patent") because the subject matter described and claimed in the Fox patent was a necessary modification of the existing technology to generate enough power to operate the adult version of the HFV product.  This modification also furthered the FDA approval of this HFV product. This means that the Royalty Agreement should extend for the life of the Fox patent, and U.S. Patent No. 7,861,716 ("the Borrello Patent"), directed to a closed loop control system for a high frequency oscillation ventilator, as well as any additional patents that may be directed to the "market applications" recited in the 1995 letter.

14.     Ross, the person who negotiated and signed the Royalty Agreement on behalf of SensorMedics in 1995, has affirmed under oath that it was SensorMedics' intention and understanding at the time the Royalty Agreement was negotiated and signed, that the term "HFV Patents", as used in the Royalty Agreement, was intended by both parties to include any and all

---

[1] Ross is a consultant for Respondent working on unrelated matters. Ross has no financial interest in the outcome of this arbitration.

APP.087

HFV patents obtained by SensorMedics (or its successor) issuing after July 1, 1995. Thus, the improvements made by SensorMedics to the HFV technology after the Royalty Agreement was signed by the parties, including the Fox patent and Borrello patent, was intended to qualify as an HFV Patent under the Royalty Agreement, thereby entitling Claimant to be paid a royalty by SensorMedics until the expiration of these patents.

15.     On June 19, 2012, Respondent tendered a check to Claimant in the amount of $597,244.00 with a letter claiming that this payment "constitutes CareFusion's full payment of all remaining obligations due to Tres Tech under the 1995 Royalty Agreement, which has now expired." Because of Respondent's attempt to try to unilaterally force Claimant into an accord and satisfaction, Claimant has not accepted the tendered check.

16.     Accordingly, Claimant demands; (i) an accounting of the average sales prices for all sales and rentals of products utilizing any HFV technology by Respondent since CareFusion took over producing products; (ii) payment of not less than $597,244.00; (iii) a finding that all future sales and rentals of products utilizing HFV technology by Respondent are subject to the Royalty Agreement; and (iv) that Respondent be ordered to provide Claimant with a proper accounting of all sales and rentals of products utilizing HFV technology in the future until the last of any HFV patents expires. Furthermore, due to Respondent's unconscionable breach of the Royalty Agreement, Claimant is also entitled to recover its attorneys' fees, costs, and pre-judgment and post-judgment interest and such other relief as the arbitrators may deem appropriate.

Respectfully submitted,

Talmage Boston, Esq.
State Bar No. 02681800

WINSTEAD PC
5400 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270
(214) 745-5400;
(214) 745-5390 (Fax)

ATTORNEYS FOR CLAIMANT
TRES TECH CORPORATION

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing document was forwarded via e-mail and fax to Respondent's counsel on this _____ day of July, 2012, at the following address:

Kevin W. Alexander
Gordon & Rees, LLP
101 W. Broadway, Suite 2000
San Diego, CA 92101

Talmage Boston

DEMAND FOR ARBITRATION– Page 8

# EXHIBIT A

## ROYALTY AGREEMENT

This agreement (hereinafter Agreement) is made and entered into as of the 1st day of July, 1995, by and between SensorMedics Critical Care Corporation, a California corporation having its principal place of business at 22705 Savi Ranch Parkway, Yorba Linda, California, 92687 (hereinafter SMCCC), and Tres Tech Corporation, a Texas corporation having its principal place of business at 1201 Vassor Circle, Plano, Texas  75075 (hereinafter Tres Tech).

### WITNESSETH

WHEREAS, Texas Research Incorporated has developed an improved high frequency ventilator, (as defined in paragraph I.2), having application for treatment of humans and animals, and

WHEREAS, Texas Research Incorporated had previously signed a "Patent and Technology Transfer, Manufacturing and Marketing Agreement", with Gould, Inc. and

WHEREAS, SensorMedics Corporation acquired from Gould, Inc. all its right, title and interest in and to its patents and patent applications pertaining to the high frequency ventilator technology and its proprietary technical information, and

WHEREAS, SensorMedics Corporation has transferred all its rights, title and interest in and to its patents and patent applications pertaining to the high frequency ventilator technology and its proprietary technical information to SMCCC, and

WHEREAS, Tres Tech acquired by purchase all of the assets of Texas Research Incorporated, and among these assets is the aforementioned Patent and Technology Transfer, Manufacturing and Marketing Agreement, and

WHEREAS, SMCCC and Tres Tech agree that, except as provided herein, this new Agreement supersedes and replaces all previous agreements and contracts, including the aforementioned Patent and Technology Transfer, Manufacturing and Marketing Agreement and the Royalty Agreement between SensorMedics Corporation and Tres Tech dated August 7th, 1989.



## I. DEFINITIONS

For the purpose of this Agreement, the following terms shall have the meanings ascribed to them by this Article I.

I.1    AFFILIATES.  The term "Affiliates" shall mean any individual, corporation, partnership, firm or other entity:  (i)  Which shall be controlled directly or indirectly by SMCCC, or (ii) in which SMCCC shall directly or indirectly own or control at least twenty five percent (25%) of the stock or voting rights, or (iii) shall directly or indirectly own or control at least twenty five percent (25%) of the stock or voting rights of SMCCC, or (iv) which shall act as a licensee or assignee of SMCCC.

I.2    HIGH FREQUENCY VENTILATOR.   The term "High Frequency Ventilator" or "HFV" shall mean the ventilator for supporting respiration developed by Texas Research Incorporated, which ventilator generates a polarized, variable amplitude, variable frequency pressure wave and has a variable inspiration to expiration ratio and is used in respiratory support.

I.3    HFV PATENTS.  The term "HFV Patents" shall mean the United States and foreign patents relating to high frequency ventilators which are owned by SMCCC subject to royalty and other obligations previously set forth in the Patent and Technology Transfer, Manufacturing and Marketing Agreement.  These patents include U.S. Patent Nos.  4,719,910; 4,747,402; 4,805,612; 4,821,709; 5,307,794 as well as all patents which were the subject of the Patent and Technology Transfer, Manufacturing and Marketing Agreement.

I.4    CLAIM.  The term "Claim" shall mean a claim in an issued, unexpired and viable patent, which claim has not been declared invalid or unenforceable by an order of a competent court or other tribunal from which no appeal has or can be taken.

I.5    HFV TECHNOLOGY.  The term "HFV Technology" shall mean all technical information whether or not patentable relating to high frequency ventilators which is owned by SMCCC subject to obligations previously set forth under the Patent and Technology Transfer, Manufacturing and Marketing Agreement, including but not limited to its product descriptions, manufacturing specifications, quality control specifications and techniques, bills of material, test procedures, software, data, drawings, know-how and trade secrets.

2

I.6    SALES.  The term "Sale" or "Sales" shall mean transfers of ownership or permanent transfers of possession or control.

1.7    AUXILIARY EQUIPMENT.  "Auxiliary Equipment" shall mean any equipment sold with High Frequency Ventilators but is not included as part of the HFV Technology.  The known list of Auxiliary Equipment sold with the High Frequency Ventilator includes humidifiers, oxygen blenders, patient circuits, Nitric Oxide analyzers, and Nitric Oxide injectors.  Tres Tech will be notified in writing by SMCCC if additional equipment is to be considered as Auxiliary Equipment.

I.8    NET SELLING PRICE.  The term "Net Selling Price" shall mean the gross amount received for sales by SMCCC of products using the HFV Technology less any charges for transportation, insurance, sales taxes, and less any prompt payment or dealer discounts actually taken, and less the retail price for any Auxiliary Equipment sold with High Frequency Ventilators.  Notwithstanding anything else contained in this definition, the Net Selling Price shall be the gross amount received for sales to the end-user, less the deductions referenced in the preceding sentence, and any royalty payment shall be based upon the gross amount received for sales to the end-user, less the deductions referenced in the preceding sentence.

I.9    RENTALS.  The term "Rentals" shall mean any temporary use which is not a sale. Rentals will not include revenue generated from contractual agreements between SMCCC and end-users where SMCCC supplies other services in addition to supplying HFV.

1.10   NET RENTAL PRICE.  The term "Net Rental Price" shall mean the gross amount received from rentals of products using the HFV Technology less any charges for transportation, insurance, sales taxes, and less any prompt payment or dealer discounts actually taken, and less the rental price for Auxiliary Equipment rented with High Frequency Ventilators.

I.11   DRIVER.  The term "Driver" shall mean a linear motor and piston assembly which is a component of a high frequency ventilator.

I.12   EQUIPMENT. The term "Equipment" shall mean apparatus or systems incorporating HFV Technology.  Equipment shall be classified in one of the following two categories:  (a) CATEGORY ONE EQUIPMENT shall be types, models, drawings and embodiments of High Frequency Ventilators, specifically, but not limited to:  (1)  Human versions which are designed to be used to treat human beings.  (2)  Veterinarian versions which are designed to be used to treat animals.  (b) CATEGORY TWO EQUIPMENT shall be apparatus and systems incorporating HFV

3

Technology which apparatus and systems are developed and/or purchased by SMCCC and not part of the HFV Technology.

1.13   QUARTER.  The term "Quarter" shall mean one of the four calendar quarters beginning January 1 and extending until March 31, beginning April 1 and extending until June 30, beginning July 1 and extending until September 30, and/or beginning October 1 and extending until December 31 as the context requires.

## II. EFFECTIVE DATE AND TERM

The Effective Date of this Agreement shall be July 1, 1995.  This Agreement will continue in force through the expiration of the last of the HFV Patents, unless sooner terminated as provided herein.

## III. CONSIDERATION

III.1   In consideration for the rights granted to SensorMedics Corporation by the Patent and Technology Transfer, Manufacturing and Marketing Agreement acquired by Tres Tech and carried forward in this agreement, Gould had previously made a payment of $300,000 and SensorMedics Corporation has previously paid $200,000.  Earned Royalty Fees payable for the term of this Agreement shall be calculated as follows:

1.  Subject to paragraph III.2, eleven hundred dollars ($1,100) Royalty Fee for any High Frequency Ventilator manufactured.
2.  One percent (1%) of the Net Rental Price generated from rental of the High Frequency Ventilator.
3.  Five percent (5%) of Net Selling Price in addition to a fixed one hundred twenty dollars ($120) for each unit using The Driver and used solely for the purpose of removing secretions from the lung.  The Net Selling Price will be for the Category One Equipment which excludes Auxiliary Equipment.
4.  In the event it is determined by a U.S. court that an entity other than Tres Tech is entitled to any portion of the royalties payable under this Agreement, SMCCC shall be entitled to a reduction in royalties equal to the future lessened value of this license as determined by the arbitration process set forth in this Agreement.

4

5. Royalty for Category Two Equipment will be negotiated between representatives of Tres Tech and SMCCC and shall occur after development of the device by SMCCC and before sales of such device take place.

6. A volume discount on the Royalty Fee shall be given in any quarter where the number of ventilators manufactured exceeds 90 units. A one hundred dollar ($100) reduction in Royalty Fee will be applied to units 91 through 120. A two hundred dollar ($200) reduction in Royalty Fee will occur on any units greater than 120.

III.2 At the end of each calendar year SMCCC will calculate the average Net Selling Price for High Frequency Ventilators sold in the United States by SMCCC to end-users in that year. The following table will be used to adjust the above Royalty Fee for High Frequency Ventilators manufactured in the following year. If the number of High Frequency Ventilators sold in the United States is under 30 units, the Royalty Fee will remain unchanged for that year. The first calendar year in which average Net Selling Price shall first be calculated will be 1996. Therefore, the potential adjustment will begin in calendar year 1997.

| Net Average Selling Price | Royalty Fee |
|---|---|
| $42,001 + | $2,300 |
| $36,001 - $42,000 | $2,050 |
| $30,001 - $36,000 | $1,750 |
| $18,001 - $30,000 | $1,100 |
| $12,001 - $18,000 | $ 850 |
| $ 6,001 - $12,000 | $ 550 |
| $ 0    - $ 6,000 | $ 250 |

III.3(a) SMCCC shall provide to Tres Tech, as part of the quarterly report, any and all information necessary for Tres Tech to understand and evaluate how the Net Rental Price and the Net Selling Price has been determined, including, but not limited to, a description of the Auxiliary Equipment, personnel and services furnished with the Rental of the High Frequency Ventilator, the cost to SMCCC of furnishing and the amount charged the customer for the Auxiliary Equipment, personnel and services, the Net Selling Price for the Category One Equipment and Auxiliary Equipment used solely for the purposes of removing secretions from the lung, and the development cost and other costs attributable to the development of Category Two Equipment so that Tres Tech will have sufficient information to evaluate the sufficiency of the royalty paid and/or to negotiate or arbitrate for a reasonable royalty in the case of Category Two Equipment.

(b) In the event the parties are unable to agree on the royalty for Category Two Equipment pursuant to III.1.5, parties agree that this matter may be submitted to arbitration and the par-



5

ties will be bound by the royalty determined by the arbiters to be a fair and reasonable royalty to be paid for Category Two Equipment.  It is specifically recognized by the parties that the appropriate royalty for Category Two Equipment may vary from time to time so that the royalty can be based upon a percentage of Net Selling Price as determined by the arbiters.

(c)    Any disagreement as to the allocation of the Net Selling Price or Net Rental Price between products using the HFV Technology and any Auxiliary Equipment, personnel or services which cannot be resolved by the parties shall be submitted to arbitration pursuant to X.8.

## IV. ACCOUNTING AND REPORTING

IV.1   SMCCC and its affiliates and licensees shall keep its books and records according to GAAP, including records of every ventilator and driver manufactured and its whereabouts for the purpose of calculating royalty.  SMCCC shall permit, and will require affiliates or licensees to permit, representatives of Tres Tech to examine their books and records providing, however, that: (i) The representatives elected by Tres Tech shall be persons to whom SMCCC and affiliates or licensees have no reasonable objection, (ii) The examination and inspection of the records and books shall not occur more than twice in any calendar year, unless SMCCC is in default in making timely royalty and other payments; (iii) Tres Tech shall retain in confidence and not disclose to any third party any information of which it may become aware of in the course of any such examination except to enforce its rights pursuant to this Agreement; (iv) SMCCC and affiliates or licensees shall be obligated to retain such books and records for a period of five years from consummation of sales and from five years from the expiration of rental agreements.

IV.2   Beginning July 1, 1995 and during the remaining term of this Agreement, after the first sale or rental of High Frequency Ventilator by SMCCC or affiliates or licensees and during the remaining term of this agreement, SMCCC shall submit to Tres Tech on or before the 30th day of January, April, July, and October a written statement setting forth the quantities, and royalty fee basis of equipment subject to the payment of royalty fees during the preceding Quarter.  Such statements shall be accompanied by payment of royalty fees in the amount shown thereby to be due Tres Tech.  After the first such statement, subsequent statements shall be submitted even if there were no sales or rentals of high frequency ventilators made by SMCCC or affiliates or licensees during any three month reporting period.  SMCCC shall be responsible for the payment of all royalties for equipment sold or rented by SMCCC, its affiliates and licensees.

6

IV.3   Notwithstanding anything herein to the contrary, a minimum payment of seventy thousand dollars ($70,000) will be made to Tres Tech by SMCCC on each of the payment dates specified in IV.2 above if SMCCC's total revenue (gross receipts from any and all sources before deduction of any expenses) for the corresponding period exceeds two million, five hundred thousand dollars ($2,500,000).  If the minimum payment exceeds the amount earned by Tres Tech as defined in Section III Consideration of this contract, the difference between the minimum payment and earned payment will be subtracted from subsequent payments which exceed the minimum payment.  The cumulative difference obtained by subtracting the earned royalty from the minimum payment ("Excess Payment") will be carried through until the beginning of the last year of the contract.  The minimum payment will not be in force for the last four quarterly payments made pursuant to this Agreement and any Excess Payment will be deducted from the royalty earned in the last four Quarters.  Tres Tech shall not be liable for any Excess Payment except by deducting any such Excess Payments from the last four quarterly royalty payments.

## V.  CONFIDENTIALITY

V.1   During the term of this agreement:  (a) Tres Tech shall not and it shall take every reasonable precaution to see that its employees, representatives and agents shall not divulge or disclose to any other person in any manner, directly or indirectly, the HFV Technology and improvements, nor any business or technical information which its employees, representatives or agents may obtain from visiting any facility of SMCCC; and (b) Except for information within the public domain, Tres Tech shall take every reasonable precaution to see that its employees, representatives and agents shall not use in any manner, or enable any other entity to use in any manner, directly or indirectly, information pertaining to the high frequency ventilator or SMCCC' business information relating thereto.

V.2   During the term of this agreement, SMCCC shall maintain and will require affiliates or licensees to maintain the HFV Technology in confidence unless and until, as to any portion of the HFV Technology and improvements:  (a) through no fault of SMCCC or affiliates or licensees the HFV Technology and improvements falls within the public domain; or (b) Is or becomes available on a non-confidential and unrestricted basis to SMCCC or affiliates or licensees from a third party; or (c) Is disclosed by Tres Tech to others on a non-confidential and unrestricted basis.

V.3   Neither party shall be liable for inadvertent disclosure or use of the information specified in paragraphs V.1 and V.2 above provided that:  (1) It uses the same degree of care and safeguarding such Information as it uses for other confidential information of like importance; and

7

(2) Upon discovery of any such inadvertent disclosure or use, It shall immediately notify the other party in writing and use its best efforts to prevent any further disclosure or use.

V.4   DISCLOSURE OR USE.   As may be necessary to the commercial exploitation of the high frequency ventilator, SMCCC and Tres Tech may transmit HFV Technology to third parties but only after receipt of such third party's written undertaking to maintain the confidentiality to the same extent as provided In paragraphs V.2 and V.3 above.

## VI. WARRANTIES

VI.1   SMCCC warrants and represents that it will use its best efforts to manufacture and market High Frequency Ventilators and HFV Technology.

VI.2   SMCCC hereby warrants and represents that it will use its best efforts to ensure that the HFV Patents are not Infringed by any other party, including, but not limited to the institution of patent infringement lawsuits, unless otherwise agreed by the parties to this Agreement. The expense of such suits to protect the rights in the HFV Patents shall be born entirely by SMCCC, and any and all recoveries from said suit or settlements shall go to SMCCC.

VI.3   Should SMCCC not take the necessary steps by litigation or otherwise to stop infringement of the HFV Patents, then Tres Tech may conduct at its own expense, and with the right to all recoveries, such litigation as it may deem necessary, provided that Tres Tech has first given a written thirty (30) day notice to SMCCC of its intention to initiate such litigation.

VI.4   SMCCC agrees that Tres Tech does not warrant that the HFV Patents and HFV Technology do not infringe any patent rights or other rights of any person, firm, company, or third party.

VI.5   SMCCC will timely pay all fees in connection with the obtaining, issuance, and maintenance of patent applications and patents, if any, to be licensed by Tres Tech to SMCCC under this Agreement. SMCCC will provide Tres Tech with a listing of all of the HFV Patents covered by this Agreement, together with a schedule showing when their maintenance fees are required to be made to the U.S. Patent and Trademark Office. SMCCC will deliver proof to Tres Tech of SMCCC's payment of all required maintenance fees not later than two months prior to the maintenance fee becoming due. If SMCCC fails to provide evidence of its timely payment of the maintenance fees for an HFV Patent, Tres Tech will pay the maintenance fee and SMCCC shall

reimburse Tres Tech the amount of any amounts paid in maintenance fees pursuant to this paragraph.

## VII.  IMPROVEMENTS

VII.1   SMCCC shall have the right to file patent applications on improvements in High Frequency Ventilator or HFV Technology.  Tres Tech agrees to disclose improvements in High Frequency Ventilator and/or HFV Technology to SMCCC in writing promptly after they are made. Tres Tech also agrees, at the request and expense of SMCCC, to do any affirmative acts reasonably required to invest in SMCCC all rights of ownership in patent applications filed on improvements and any patents that may be granted therefrom on High Frequency Ventilator and/or HFV Technology, and to assist and cooperate with SMCCC in the preparation, prosecution and enforcements of said applications and patents, including but not limited to the making of oaths and declarations and the giving of testimony.

VII.2   SMCCC shall advise Tres Tech of SMCCC's intention in respect to filing a patent application on any improvement, within ninety (90) days after such improvement is disclosed to SMCCC.  Should SMCCC elect not to file a patent application on any improvement, Tres Tech may, at its expense, file patent applications thereafter at the written request and expense of Tres Tech.  SMCCC agrees to assign such patent application and any patents that may be granted therefrom to Tres Tech.  With respect to any patent application or patent assigned by SMCCC to Tres Tech pursuant to the paragraphs VII.1 and VII.2, any such patent application or patent shall be deemed to be Category Two Equipment.

VII.3   SMCCC agrees that for any improvements by SMCCC in the HFV Patents or HFV Technology that said improvements shall be deemed to be either Category One Equipment or Category Two Equipment, as applicable.



9

## VIII. COMPETITION IN FIELD PROSCRIBED;
## DEVELOPMENTS OUTSIDE FIELD

VIII.1 (a)    Tres Tech agrees that during the term of this agreement it will not compete with SMCCC in the field of high frequency ventilators nor assist any third party to compete with SMCCC in such field.

(b)    Tres Tech hereby grants SMCCC a right of first refusal in respect to the exclusive right to commercialize any developments made by Tres Tech outside the field of high frequency ventilators, and agrees to negotiate with SMCCC in good faith concerning such right.

## IX. TERMS AND CONDITIONS

IX.1   Tres Tech shall have the right to terminate this agreement should SMCCC fail to submit statements or to pay royalty fees as herein provided by giving SMCCC sixty (60) days written notice of termination, which notice shall specify the default relied upon, in which event this agreement shall terminate sixty (60) days after the date of such notice; provided, however, that if during such sixty (60) day period SMCCC shall remedy such default, then such notice of termination shall be null and void.

IX.2   Either party may terminate this agreement in the event the other party:  (a) Fails to perform any of the material covenants or to carry out any of the material obligations hereunder by giving such other party sixty (60) days written notice of termination, which notice shall specify the default relied on, in which event this agreement shall terminate sixty (60) days after the date of such notice; provided, however, that if during such sixty (60) day period such other party shall remedy such default, then such notice of termination shall be null and void.  (b) Makes any assignment for the benefit of creditors or has any receiver appointed for or any execution levied on all or a substantial part of such other party's business or assets or has any voluntary or involuntary petition in bankruptcy filed for or against it, by giving such other party thirty (30) days written notice of termination, in which event this agreement shall terminate thirty (30) days after the date of such notice; (c) Is liquidated, terminated or dissolved, except where such liquidation, termination or dissolution is an incident of a merger or corporate reorganization in the ordinary course of business, by giving such other party written notice of termination, in which event this agreement shall terminate immediately.

IX.3   Upon termination of this agreement:  (a) If termination is the result of a default by SMCCC, Tres Tech may elect in writing to require SMCCC to reassign the HFV Patents and the HFV Technology to Tres Tech or its successor, and SMCCC will promptly reassign such HFV Patents and HFV Technology to Tres Tech; provided, however, that should SMCCC reassign the HFV Patents and the HFV Technology to Tres Tech, SMCCC will be permitted to sell or rent all equipment which is then in the form of finished goods or work in process upon the payment of the applicable royalty.

IX.4   Upon termination of this agreement:  (a) If termination is the result of a default by Tres Tech, SMCCC may elect in writing to require Tres Tech to reassign the HFV Patents and the HFV Technology to SMCCC or its successor, and Tres Tech shall promptly reassign such HFV Patents and HFV Technology to SMCCC; provided, however, that should Tres Tech reassign the HFV Patents and the HFV Technology to SMCCC, Tres Tech will be permitted to sell or rent all equipment which is in the form of finished goods or work in process.

## X. MISCELLANEOUS PROVISIONS

X.1   ASSIGNMENT.  Neither this agreement nor any interest herein may be assigned, in whole or in part, by either party without the prior written consent of the other party, except that, without securing such prior consent, SMCCC may assign this agreement to any purchaser of substantially all of the business of SMCCC to which the subject matter hereof relates, provided such purchaser assumes in writing all obligations of SMCCC herein, and such purchaser is financially able to meet the financial obligations of this Agreement.

X.2   BINDING EFFECT.  This agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns.

X.3   CONSENT.  Whenever consent or approval of either party is required to permit the other party to proceed in any activity permitted under this agreement, such consent shall not be unreasonably withheld or delayed.

X.4   CONSTRUCTION.  This agreement shall be deemed to be made and entered into pursuant to the laws of the United States and the State of California and shall be interpreted and construed in accordance with the laws of the State of California.

11

X.5   PUBLICITY.  Except as may be required by applicable laws and regulations or a court of competent jurisdiction, or as required to meet credit and financing arrangements, or as required or appropriate in the reasonable judgment of either party to satisfy the disclosure requirements of any applicable securities law or regulation or any applicable accounting standard, neither party shall make any public release respecting this agreement and the terms hereof without the prior consent of the other party.

X.6   NOTICE.  All notices, statements and reports required or permitted by this agreement shall be in writing and deemed to have been effectively given and received five (5) days after the date of dispatch by certified or registered mail, postage prepaid, to the party to whom any such notice, statement or report is to be given, addressed as follows:

| For SMCCC: | SensorMedics Critical Care<br>22705 Savi Ranch Parkway<br>Yorba Linda, CA  92687<br>Attention:  President |
|---|---|
| For Tres Tech: | Tres Tech Corporation<br>1201 Vassor Circle<br>Piano, Texas  75075 |

Either party may change its address for the purpose of this paragraph by notice given pursuant to this paragraph.

X.7   FORCE MAJEURE.  Neither party shall be in default hereunder for any failure of or delays in performance resulting from causes beyond its control, such as acts of God or the public enemy; accidents; fire; explosion; acts of war including insurrection, revolution, riot or embargo; rights of third persons (other than those conferred or permitted to arise in contravention of the obligations of this agreement) established in actions at law or in equity, including injunctions, restraining orders and stays of all kinds; and statutory and governmental prohibitions, restrictions and/or regulations; provided that if any such cause exists for a period of six (6) consecutive months, the parties shall confer to determine whether and on what terms and condition to continue or terminate this agreement.

X.8   ARBITRATION.  The parties agree to use their best efforts to amicably resolve any dispute or disagreement which arises with regard to this agreement.  In the event any dispute or disagreement with respect to this Agreement arises which cannot be resolved amicably, or in the event the parties cannot agree as to the amount of royalty to be paid pursuant to this Agreement, then such dispute, disagreement or inability to agree shall be settled by arbitration conducted in



12

accordance with the Rules of the American Arbitration Association. The Arbitration shall be conducted by a three-member panel pursuant to the Federal Arbitration Act and shall be binding. The Arbitration shall take place in Phoenix, Arizona and judgment upon the award rendered by the arbiters may be entered in any court of competent jurisdiction.

X.9   SEVERABILITY. This Agreement shall be construed and interpreted to avoid violating any applicable law. If any part, segment, or clause of this Agreement is held illegal or unenforceable by any court of competent jurisdiction, such part, segment, or clause shall be deemed separable from the remaining provisions of this Agreement and shall not affect or impair the validity or enforceability of the remaining provisions of this Agreement. The parties direct the arbiters and court which interprets this Agreement to reform it if needed to make the remaining portions of the Agreement enforceable.

X.10   HEADINGS. The headings of the several articles are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretations of this agreement.

X.11   WAIVER. The waiver of a default hereunder by one party may be effected only by a written acknowledgment signed by the other party and shall not constitute a waiver of any other default. The failure of either party to enforce any right or remedy for one default shall not be deemed a waiver of said right or remedy if the other party persists in such default or commits any other default, nor shall such failure in any way affect the validity of this agreement or any part hereof.

X.12   ENTIRE UNDERSTANDING. This written instrument constitutes the entire understanding and agreement between the parties with respect to the subject matter hereof, integrates all prior understandings and agreements with respect thereto, and shall not be varied, amended or supplemented except in writing of even or subsequent date, executed by the parties.

13

IN WITNESS WHEREOF, the parties hereto have executed this agreement as of the day and year first above written.

SENSORMEDICS CRITICAL CARE CORPORATION

ATTEST:

*Bonney Collier*

TRES TECH CORPORATION

ATTEST:

14

# EXHIBIT B

C-2515

## PATENT AND TECHNOLOGY TRANSFER,
## MANUFACTURING AND MARKETING AGREEMENT

THIS AGREEMENT (hereinafter AGREEMENT), made and entered into as of the ~~15th~~ 30th day of ~~January 1985~~ ~~November 1984~~ NOVEMBER 1984, by and between:

GOULD INC., a Delaware corporation, having its principal place of business at 10 Gould Center, Rolling Meadows, Illinois 60008 (hereinafter GOULD); and

TEXAS RESEARCH INC., a Texas corporation, having its principal place of business at 8603 Botts Lane, San Antonio, Texas 78217 (hereinafter TRI);

## WITNESSETH:

WHEREAS, TRI is in the business, *inter alia*, of designing and developing ventilators for supporting human and animal respiration; and

WHEREAS, GOULD is in the business, *inter alia*, of designing, developing, manufacturing and selling various types of medical equipment; and

WHEREAS, TRI has developed an improved HIGH FREQUENCY VENTILATOR (as defined in Paragraph 1.3) having application for treatment of humans and animals; and

WHEREAS, TRI has filed United States and foreign patent applications on said improved HIGH FREQUENCY VENTILATOR; and

-1-

**Exhibit "B"**

C-2515

WHEREAS, TRI possesses proprietary technical information relating to said improved HIGH FREQUENCY VENTILATOR; and

WHEREAS, on October 8, 1984, GOULD and TRI entered into a Letter of Intent (hereinafter LETTER OF INTENT) pursuant to which the parties agreed on certain terms and conditions to be included in this AGREEMENT and to certain matters collateral hereto; and

WHEREAS, as set forth in the LETTER OF INTENT, Gould wishes to acquire from TRI and TRI wishes to transfer to Gould all of TRI's right, title and interest in and to TRI's aforesaid patent applications and any patents that may be granted therefrom, and TRI's aforesaid proprietary technical information; and

WHEREAS, as set forth in the LETTER OF INTENT, GOULD and TRI desire that TRI undertake, on behalf of GOULD for a certain period of time, the manufacturing and marketing of the veterinarian version of the HIGH FREQUENCY VENTILATOR; and

WHEREAS, as set forth in the LETTER OF INTENT, GOULD and TRI desire that TRI undertake for a certain period of time the manufacture of DRIVERS (as defined in Paragraph 1.13) for the human treatment version of the HIGH FREQUENCY VENTILATOR for supplying GOULD's requirements for a limited quantity of such DRIVERS; and

WHEREAS, as set forth in the LETTER OF INTENT, in connection with a contract to be negotiated by GOULD and TRI with the National Institute of Health (hereinafter NIH) for supplying NIH with a specified quantity of the human treatment version of the HIGH FREQUENCY VENTILATOR, should said contract be awarded to

-2-

**Exhibit "B"**

C-2515

GOULD, GOULD and TRI desire that GOULD have an option to acquire from TRI a portion of the HIGH FREQUENCY VENTILATORS to be supplied to NIH;

NOW, THEREFORE, the parties hereto, intending to be legally bound hereby, covenant and agree that:

## I.  DEFINITIONS

For the purpose of this AGREEMENT, the following terms shall have the meanings ascribed to them by this Article I.

1.1    AFFILIATES.    The term AFFILIATES shall mean any individual, corporation, partnership, firm or other entity: (i) which shall be controlled directly or indirectly by GOULD, or (ii) in which GOULD shall directly or indirectly own or control at least twenty-five percent (25%) of the stock or voting rights, or (iii) which shall directly or indirectly own or control at least twenty-five percent (25%) of the stock or voting rights of GOULD.

1.2    EFFECTIVE DATE.    The term EFFECTIVE DATE shall mean the day and year first above written.

1.3    HIGH FREQUENCY VENTILATOR or HFV.    The term HIGH FREQUENCY VENTILATOR or HFV shall mean the ventilator for supporting respiration developed by TRI, which ventilator generates a polarized, variable-amplitude, variable-frequency pressure wave and has a variable inspiration-to-expiration ratio.

-3-                                    **Exhibit "B"**

C-2515

1.4   <u>DISPOSABLE PRODUCTS</u>.   The term DISPOSABLE PRODUCTS shall mean products specifically designed and adapted to be used with HIGH FREQUENCY VENTILATORS in connection with the treatment of patients, which products are intended to be discarded after use with a single patient.

1.5   <u>HFV PATENTS</u>.   The term HFV PATENTS shall mean the United States and foreign patent applications relating to HIGH FREQUENCY VENTILATORS which are owned by TRI and identified in Exhibit A attached hereto and any patents that may be granted therefrom.

1.6   <u>PATENT CLAIM</u>.   The term PATENT CLAIM shall mean a claim in an issued, unexpired and viable patent, which claim has not been declared invalid or unenforceable by an order of a competent court or other tribunal from which no appeal has or can be taken, and a claim in a pending United States patent application but not in any pending foreign patent application.

1.7   <u>HFV TECHNOLOGY</u>.   The term HFV TECHNOLOGY shall mean all technical information, whether or not patentable, relating to HIGH FREQUENCY VENTILATORS which is owned by TRI as of the EFFECTIVE DATE, including but not limited to product descriptions, manufacturing specifications and techniques, quality control specifications and techniques, bills of material, test procedures, software, data, drawings, know-how and trade secrets.

-4-

**Exhibit "B"**

C-2515

1.8  IMPROVEMENT.  The term IMPROVEMENT shall mean any improvement or invention affecting HIGH FREQUENCY VENTILATORS which is developed by TRI after the EFFECTIVE DATE, including but not limited to improvements and inventions resulting in reduced production costs, improved performance, increased service life, broadened applicability, increased marketability and improved appearance.

1.9  SALES.  The term SALES shall mean transfers of title, or permanent transfers of possession or control.

1.10  NET SELLING PRICE.  The term NET SELLING PRICE shall mean the gross amount received for SALES of products less any charges for transportation, insurance and sales taxes, and less any promptness-of-payment discounts actually taken. With respect to products which are not sold but which are otherwise permanently disposed of by GOULD or AFFILIATES, or are sold by GOULD to AFFILIATES, NET SELLING PRICE shall be the most recent NET SELLING PRICE offered to unaffiliated customers of GOULD for the most nearly equivalent products.

1.11  RENTALS.  The term RENTALS shall mean temporary transfers of possession or control.

1.12  NET RENTAL FEE.  The term NET RENTAL FEE shall mean the fee paid for RENTALS of products less any charges for transportation, insurance and sales taxes, and less any promptness-of-payment discounts actually taken.  With respect to products

-5-

**Exhibit "B"**

C-2515

which are not rented or leased but which are otherwise temporarily disposed of by GOULD or AFFILIATLS, or are rented or leased by GOULD to AFFILIATES, NET RENTAL FEE shall be the most recent NET RENTAL FEE offered to unaffiliated customers of GOULD for the most nearly equivalent products.

1.13  DRIVER.  The term DRIVER shall mean a linear motor and piston assembly which is a component of a HIGH FREQUENCY VENTILATOR.

1.14  EQUIPMENT.  The term EQUIPMENT shall mean apparatus or systems incorporating HFV TECHNOLOGY manufactured or sold by GOULD.  EQUIPMENT shall be classified in one of the following two categories:

(a)  CATEGORY ONE EQUIPMENT shall be types, models, drawings and embodiments of HIGH FREQUENCY VENTILATORS existing as of the EFFECTIVE DATE generally, and specifically:

(1)  Institutional versions which are designed to be used by any type of health care facility to treat human beings.

(2)  Home care versions which are designed to be used to treat human beings outside of institutions.

(3)  Emergency medical service versions which are designed to be used to treat human beings for life saving and emergency life support applications.

(4)  Veterinarian versions which are designed to be used to treat animals.

-6-

**Exhibit "B"**

APP.111

C-2515

(b)   CATEGORY TWO EQUIPMENT shall be apparatus and systems incorporating HFV TECHNOLOGY which apparatus and systems are developed after the EFFECTIVE DATE.

1.15   ROYALTY FEE BASE.  The term ROYALTY FEE BASE shall mean:

(a)   For CATEGORY ONE EQUIPMENT - one hundred percent (100%) of NET SELLING PRICE or NET RENTAL FEE, as applicable; and

(b)   For CATEGORY TWO EQUIPMENT - the cost of any parts or components which incorporate HFV TECHNOLOGY divided by the cost of the entire apparatus or system in which such parts or components are included and the resultant thereof multiplied by NET SELLING PRICE or NET RENTAL FEE, as applicable, of such apparatus or system.

## II.  ASSIGNMENT

2.1   TRI hereby assigns to GOULD its successors and assigns the entire right, title and interest in and to the HFV PATENTS, the HFV TECHNOLOGY and IMPROVEMENTS.

2.2   TRI agrees, at the request and expense of GOULD, to do any affirmative acts reasonably required to vest in GOULD all rights of ownership in and to the HFV PATENTS, the HFV TECHNOLOGY and IMPROVEMENTS, and to assist and cooperate with GOULD in the prosecution and enforcement of the HFV PATENTS, including but not

-7-

Exhibit "B"

C-2515

limited to the making of oaths and declarations and the giving of testimony.

2.3   GOULD agrees not to take any action to in any way hinder or discourage or impede the granting of patents from the patent applications comprising the HFV PATENTS, and further agrees not to cause or encourage any third party to take any such action; provided, however, GOULD may elect not to continue the prosecution or maintenance of any patent application or patent included in the HFV PATENTS, whereupon GOULD shall give adequate notice of such election to TRI and TRI shall have the option, at its expense, to continue such prosecution and maintenance.

2.4   GOULD hereby grants TRI a paid-up, non-exclusive, worldwide license under the HFV PATENTS, the HFV TECHNICAL INFORMATION and IMPROVEMENTS in all fields outside the medical and veterinarian equipment fields.

### III.  CONSIDERATION

3.1   In consideration for the foregoing assignment and other rights herein granted to GOULD, GOULD agrees to make the following payments to TRI:

(a)   A first installment payment of Three Hundred Thousand Dollars ($300,000.00) payable upon execution of this AGREEMENT:

(b)   A second installment payment of Two Hundred Thousand Dollars ($200,000.00) payable upon submission to the United States Food and Drug Administration of an application for Pre-Market Approval (hereinafter PMA) of a human treatment version of the HIGH FREQUENCY VENTILATOR in accordance with Section 515 of the Food, Drug and Cosmetics Act.  Gould and TRI agree to take all reasonable actions for expediting the submission of said PMA application:

-8-                                    **Exhibit "B"**

C-2515

(c)   Earned royalty fees payable for the term of the AGREEMENT calculated as follows:

(1)   Five percent (5%) of the first Three Hundred Million Dollars ($300,000,000.00) of combined SALES and RENTALS, as measured by the ROYALTY FEE BASE, of EQUIPMENT sold and rented by GOULD and AFFILIATES; and

(2)   Four percent (4%) of any amount exceeding Three Hundred Million Dollars ($300,000,000.00) of combined SALES and RENTALS, as measured by the ROYALTY FEE BASE, of EQUIPMENT sold and rented by GOULD and AFFILIATES.

(d)       In the event that the manufacture, use or sale of any EQUIPMENT is not covered by one or more PATENT CLAIMS, the earned royalty fees in respect to such EQUIPMENT as specified in subparagraph (c) above shall be reduced by fifty percent (50%) and shall be payable for twenty-one years from the EFFECTIVE DATE.

(e)   A royalty fee of two percent (2%) of SALES, as measured by NET SELLING PRICE, of DISPOSABLE PRODUCTS sold by GOULD and AFFILIATES and shall be payable for ten (10) years from the EFFECTIVE DATE.

3.2(a)   No royalty fees shall be payable by GOULD to TRI for HIGH FREQUENCY VENTILATORS and parts and components therefor which are manufactured for GOULD by TRI.

(b)   No royalty fees shall be payable by GOULD to TRI for the manufacture and use by GOULD and AFFILIATES of HIGH FREQUENCY VENTILATORS for testing and evaluation purposes.

**Exhibit "B"**

- 9 -

C-2515

## I.V.   ACCOUNTING AND REPORTING

4.1    GOULD shall keep and will require AFFILIATES to keep accurate and complete records and books of account with respect to SALES and RENTALS.   Such records and books shall be kept in sufficient detail as to enable TRI to ascertain the royalty fees due hereunder.   Upon reasonable notice, GOULD shall permit and will require AFFILIATES to permit representatives of TRI to examine such books and records; provided, however, that: (i) the representatives selected by TRI shall be persons to whom GOULD and AFFILIATES have no reasonable objection; (ii) the examination and inspection of the records and books shall not occur more than twice in any calendar year; (iii) TRI shall retain in confidence and not disclose to any third party any information of which it may become aware in the course of any such examination; and (iv) GOULD and AFFILIATES shall be obligated to retain such books and records only for a period of five (5) years from consummation of SALES and RENTALS.

4.2    GOULD shall submit to TRI, on or before the thirtieth (30th) day of January, April, July and October after the first SALE or RENTAL of HIGH FREQUENCY VENTILATORS by GOULD or AFFILIATES and during the remaining term of this AGREEMENT, a written statement setting forth the quantities, NET SELLING PRICES, NET RENTAL FEES and ROYALTY FEE BASES of EQUIPMENT and DISPOSABLE PRODUCTS subject to the payment of royalty fees sold and rented by GOULD and AFFILIATES during the immediately preceding three (3) months.   Such statements shall be accompanied

-10-

**Exhibit "B"**

C-2515

by payment of royalty fees in the amount shown thereby to be due
TRI. After the first such statement, subsequent statements shall
be submitted even when no SALES or RENTALS of HIGH FREQUENCY
VENTILATORS have been made by GOULD or AFFILIATES during any
three- (3) month reporting period.

## V. TECHNOLOGY TRANSFER ASSISTANCE

5.1   TRI agrees to provide technology transfer assistance
to GOULD to facilitate the transfer of the HFV TECHNOLOGY to
GOULD, to assist GOULD in obtaining PMA for the HIGH FREQUENCY
VENTILATOR by the United States Food and Drug Administration, and
to assist GOULD in obtaining approval for the HIGH FREQUENCY
VENTILATOR by Underwriters Laboratory, said assistance to
include producing for GOULD, at no additional production cost to
GOULD, copies of all TRI documents and other information
relating to the HFV TECHNOLOGY as such existed on December 1,
1984.

5.2   At the written request of GOULD during the term of
this AGREEMENT, TRI agrees to provide the consulting services of
one or more persons knowledgeable with the HFV TECHNOLOGY to
assist GOULD in the further development of the HIGH FREQUENCY
VENTILATOR. Upon receipt of an appropriate invoice from TRI,
GOULD agrees to compensate TRI for such services at the rate of
sixty dollars ($60.00) per hour or portion thereof, and to
reimburse TRI for the reasonable travel and living expenses of

-11-

Exhibit "B"

C-2515

TRI personnel while performing such services away from TRI's place of business.

## VI. CONFIDENTIALITY

6.1    During the term of this AGREEMENT:

(a)   TRI shall not, and it shall take every reasonable precaution to see that its employees, representatives and agents shall not divulge or disclose to any other person in any manner, directly or indirectly, the HFV TECHNOLOGY and IMPROVEMENTS, nor any business or technical information which its employees, representatives or agents may obtain from visiting any facility of GOULD; and

(b)   Except for information within the public domain, TRI shall not, and shall take every reasonable precaution to see that its employees, representatives and agents shall not use in any manner, or enable any other entity to use in any manner, directly or indirectly, information pertaining to the HIGH FREQUENCY VENTILATOR or GOULD's business information relating thereto.

6.2    During the term of this AGREEMENT, GOULD shall maintain and will require AFFILIATES to maintain the HFV TECHNOLOGY and IMPROVEMENTS in confidence unless and until, as to any portion of the HFV TECHNOLOGY and IMPROVEMENTS, such portion:

-12-

**Exhibit "B"**

C-2515

(a)    is within or through no fault of GOULD or
AFFILIATES later falls within the public domain; or

(b) is or becomes available on a nonconfidential and
unrestricted basis to GOULD or AFFILIATES from a third
party; or

(c) is disclosed by TRI to others on a nonconfiden-
tial and unrestricted basis.

6.3    Neither party shall be liable for inadvertent dis-
closure or use of the information specified in Paragraphs 6.1 and
6.2 above, provided that: (1) it uses the same degree of care in
safeguarding such information as it uses for other confidential
information of like importance; and (ii) upon discovery of any
such inadvertent disclosure or use, it shall notify the other
party in writing and use its best efforts to prevent any further
disclosure or use.

6.4    As may be necessary to the commercial exploitation of
the HIGH FREQUENCY VENTILATOR, GOULD and TRI may transmit HFV
TECHNOLOGY to third parties, but only after receipt of such third
party's written undertaking to maintain the same in confidence to
the same extent as provided in Paragraphs 6.2 and 6.3 above.

## VII.  WARRANTIES

7.1    At the time of the approval of this AGREEMENT in
accordance with Paragraph 7.2 below, TRI hereby warrants that it

-13-

**Exhibit "B"**

C-2515

has sole title to the HFV PATENTS and the HFV TECHNOLOGY and has full power and authority to enter into this AGREEMENT.

7.2    TRI hereby warrants that it will exercise its best efforts to obtain the approval of the Court in the bankruptcy proceeding in which TRI is the debtor, pending in the United States Bankruptcy Court, Western District of Texas, Case No. 5-84-00843-T, to enter into this AGREEMENT and to assign the HFV PATENTS, the HFV TECHNOLOGY and IMPROVEMENTS to GOULD.

## VIII. COMPLETION OF WORK ASSIGNMENTS

8.1    Should TRI be unable for any reason to complete the work assignments undertaken by TRI hereunder in accordance with agreed on delivery schedules or otherwise on a timely basis, GOULD shall have the right to acquire for fair market price and take possession from TRI of raw materials, work in process and finished goods relating to such work assignments and to manufacture or have manufactured the unfilled balance of any order which TRI is unable to complete.

## IX. FREEDOM OF ACTION

9.1    TRI agrees to take appropriate action in the aforesaid bankruptcy proceeding, and to the extent possible in respect to

-14-                        Exhibit "B"

C-2515

any applicable governmental taxing authority and any future creditor not a party to said bankruptcy proceeding to obtain written assurance that should TRI be unable for any reason to complete any work assignments undertaken by TRI hereunder in accordance with agreed on delivery schedules or otherwise on a timely basis, GOULD shall have the right to acquire for fair market value and take possession from TRI of raw materials, work in process and finished goods relating to such work assignments.

## X.  IMPROVEMENTS

10.1   GOULD shall have the right to file patent applications on IMPROVEMENTS.  TRI agrees to disclose IMPROVEMENTS to GOULD in writing promptly after they are made.  TRI also agrees, at the request and expense of GOULD, to do any affirmative acts reasonably required to vest in GOULD all rights of ownership in patent applications filed on IMPROVEMENTS and any patents that may be granted therefrom, and to assist and cooperate with GOULD in the preparation, prosecution and enforcement of said applications and patents, including but not limited to the making of oaths and declarations and the giving of testimony.

10.2   GOULD shall advise TRI of GOULD's intentions in respect to filing a patent application on any IMPROVEMENT within ninety (90) days after such IMPROVEMENT is disclosed to GOULD.

-15-

Exhibit "B"

C-2515

Should GOULD elect not to file a patent application on any IMPROVEMENT, TRI may, at its expense, file patent applications thereon. Thereafter, at the written request and expense of TRI, GOULD agrees to assign such patent application and any patent that may be granted therefrom to TRI. In respect to any patent application or patent assigned by GOULD to TRI pursuant to this Paragraph 10.2, TRI grants to GOULD a paid-up, non-exclusive, worldwide license under such patent application and patent, to make, use and sell the subject matter thereof in the medical and veterinarian equipment fields.

## XI VETERINARIAN VERSION

11.1 The parties agree that TRI will manage the manufacturing and marketing of the veterinarian version of the HIGH FREQUENCY VENTILATOR (hereinafter VET HFV) for a fee equal to twenty percent (20%) of the NET SELLING PRICE of VET HFV units. The cost of such VET HFV units to GOULD as manufactured by TRI shall be Four Thousand Dollars ($4,000.00) per unit f.o.b. TRI's plant. The NET SELLING PRICE of such VET HFV units as marketed by TRI shall be no less than an amount which will provide a profit to GOULD of at least twenty percent (20%) of NET SELLING PRICE. TRI agrees to warrant such VET HFV units to be free from defects in materials and workmanship, f.o.b. TRI's plant, for a period of three (3) years or three thousand (3,000) hours of operational time which ever occurs first.

-16-

Exhibit "B"

C-2515

11.2   TRI's right to manage the manufacturing and marketing of the VET HFV shall continue until the first to occur of:

(a)   GOULD pays TRI earned royalty fees in accordance with Paragraphs 3.1(c) and 3.1(d) above of at least One Hundred Fifty Thousand Dollars ($150,000.00) for each of two consecutive three (3) month reporting periods after which GOULD, without cause or default by TRI, may terminate such right upon ninety (90) days written notice; provided, however, thereafter should the earned royalty fees paid by GOULD to TRI in accordance with Paragraphs 3.1(c) and 3.1(d) above be less than One Hundred Fifty Thousand Dollars ($150,000.00) for any three (3) month reporting period, GOULD will pay TRI the difference between One Hundred Fifty Thousand Dollars ($150,000.00) and the earned royalty fees paid; or

(b)   GOULD, for cause or default by TRI, terminates such right upon ninety (90) days written notice; provided, however, that such notice shall specify the cause or default relied on and should TRI cure such cause or default within such ninety (90) day period, then such notice of termination shall be null and void; or

(c)   Ten years from the EFFECTIVE DATE.

11.3   To define TRI's management responsibilities under Paragraph 11.1 above, representatives of GOULD and TRI will meet from time-to-time to plan and agree upon the strategy to be employed by TRI for manufacturing and marketing VET HFV units

-17-

**Exhibit "B"**

C-2515

during the ensuing period.  Failure to agree within a reasonable time upon the strategy to be employed for the ensuing period shall be cause for either party to seek arbitration in accordance with Paragraph 21.8 below.

## XII  DRIVERS

12.1  GOULD agrees that for a period of at least one (1) year from the EFFECTIVE DATE, it will purchase its requirements for DRIVERS for the human treatment version of the HIGH FREQUENCY VENTILATOR from TRI, up to two hundred fifty (250) DRIVERS per month.  During such one (1) year period, TRI's price to GOULD for DRIVERS shall be not more than Four Hundred Dollars ($400.00) each for 480 cc units and, for other sized units, not more than twice TRI's initial manufacturing cost.

12.2  GOULD agrees that for a period of nine (9) years after the one (1) year period specified in Paragraph 12.1 above, it will continue to purchase its requirements for DRIVERS from TRI, up to two hundred fifty (250) DRIVERS per month; provided, however, GOULD's obligation under this Paragraph 12.2 shall terminate should TRI's price to GOULD for DRIVERS exceed one hundred twenty percent (120%) of the price to GOULD for comparable DRIVERS from an independent third party; provided further, however, that should TRI's price to GOULD exceed one hundred twenty percent (120%) of said third party's price, TRI

-18-

**Exhibit "B"**

C-2515

shall be permitted to revise its price downwardly to be within one hundred twenty percent (120%) of said third party's price whereupon GOULD's obligation to purchase DRIVERS from TRI shall continue.

12.3   Nothing contained in Paragraphs 12.1 and 12.2 above shall obligate GOULD to purchase any minimum quantity of DRIVERS from TRI.

## XIII.  NIH CONTRACT

13.1   GOULD and TRI are planning to negotiate with NIH for the purpose of obtaining a contract to be awarded to GOULD for supplying NIH with the human treatment version of the HIGH FREQUENCY VENTILATOR (hereinafter HT HFV). Should GOULD be awarded such contract within one (1) year from the EFFECTIVE DATE, the parties agree that GOULD may elect to obtain from TRI, and should GOULD so elect, TRI agrees to manufacture and supply to GOULD, a portion of the HT HFV units to be supplied by GOULD to NIH pursuant to said contract. TRI's price to GOULD for each such HT HFV unit will be the sum of Two Thousand Dollars ($2,000.00) plus one-half (1/2) the difference between the unit selling price and Two Thousand Dollars ($2,000.00).

13.2   The size of the prospective order from NIH for HT HFV units is not known by the parties. However, should GOULD be awarded the contract for supplying HT HFV units to NIH and should

-19-

**Exhibit "B"**

C-2515

GOULD elect to obtain a portion of such HT HFV units from TRI, the parties agree that such portion shall be as follows:

For the first forty (40) units - one hundred percent (100%);

For the next forty (40) units - fifty percent (50%); and

For the balance of the order in excess of eighty (80) units - twenty-five percent (25%).

13.3   In lieu of the foregoing, should GOULD be awarded the contract for supplying HT HFV units to NIH, the parties agree that GOULD may elect to obtain and, should GOULD so elect, TRI agrees to manufacture and supply to GOULD, all of the HT HFV units to be supplied by GOULD to NIH pursuant to said contract.

## XIV.  MARKING

14.1   TRI agrees to apply GOULD's trademark and trade name to all HIGH FREQUENCY VENTILATOR units of every type manufactured by TRI for GOULD.   GOULD will instruct TRI concerning use of the GOULD trademark and trade name.   All use of the GOULD trademark and trade name by TRI shall first be approved by GOULD.

## XV.  FUNDING

15.1   TRI is responsible for obtaining the financing required for TRI to successfully complete the manufacturing and marketing assignments undertaken by TRI hereunder.   GOULD is not

-20-                                   Exhibit "B"

C-2515

obligated and confirms its intention not to advance any funds to TRI to finance manufacturing and marketing of HIGH FREQUENCY VENTILATOR units by TRI.

## XVI.  LIMITED RIGHTS

16.1   TRI's manufacturing and marketing rights specified in Articles XI, XII, and XIII above are limited to the time periods and quantities specified and no additional rights are intended or implied.

## XVII.  COMPETITION IN FIELD PROSCRIBED; DEVELOPMENTS OUTSIDE FIELD

17.1   (a) TRI agrees that during the term of this AGREEMENT, it will not compete with GOULD in the field of HIGH FREQUENCY VENTILATORS intended either for treatment of humans or animals nor assist any third party to compete with GOULD in such field.

(b) TRI hereby grants GOULD a right of first refusal in respect to the exclusive right to commercialize any developments made by TRI outside the field of HIGH FREQUENCY VENTILATORS, and agrees to negotiate with GOULD in good faith concerning such right.

## XVIII.  INVESTIGATIONAL DEVICE EXEMPTIONS

18.1   TRI agrees to obtain an assignment of the Investigational Device Exemptions number for the HIGH FREQUENCY VENTILATOR from Healthdyne, Inc. to GOULD.

**Exhibit "B"**

-21-

C-2515

## XIX.  COST AND PRICE ESCALATION

19.1    All dollar amounts specified herein except for the amounts specified in Paragraphs 3.1(a), 3.1(b) and 3.1(c) relating to the first and second installment payments and earned royalty fees, respectively, shall be adjusted annually effective January 1 to reflect any increase or decrease in the Producer Price Index for the previous year with the base year being 1984.

## XX.  TERM AND TERMINATION

20.1    Except as otherwise provided herein, this AGREEMENT shall continue in full force and effect until the later of (i) the date on which the last of the TRI PATENTS expires or becomes abandoned or otherwise becomes ineffective, or (ii) twenty-one (21) years from the EFFECTIVE DATE.

20.2    TRI shall have the right to terminate this AGREEMENT should GOULD fail to submit statements or to pay royalty fees as herein provided, by giving GOULD sixty (60) days' written notice of termination, which notice shall specify the default relied on, in which event this AGREEMENT shall terminate sixty (60) days after the date of such notice; provided, however, that, if during such sixty- (60) day period GOULD shall remedy such default, then such notice of termination shall be null and void.

-22-

**Exhibit "B"**

C-2515

20.3   Either party may terminate this AGREEMENT 'in the event the other party:

(a)   fails to perform any of the material covenants or to carry out any of the material obligations hereunder, by giving such other party sixty (60) days' written notice of termination, which notice shall specify the default relied on, in which event this AGREEMENT shall terminate sixty (60) days after the date of such notice; provided, however, that if during such sixty- (60) day period such other party shall remedy such default, then such notice of termination shall be null and void;

(b)   makes any assignment for the benefit of creditors or has any receiver appointed for or any execution levied on all or a substantial part of such other party's business or assets or has any voluntary or involuntary petition in bankruptcy filed for or against it, by giving such other party thirty (30) days' written notice of termination, in which event this AGREEMENT shall terminate thirty (30) days after the date of such notice;

(c)   is liquidated, terminated or dissolved, except where such liquidation, termination or dissolution is an incident of a merger or corporate reorganization in the ordinary course of business, by giving such other party written notice of termination, in which event this AGREEMENT shall terminate immediately.

-23-

**Exhibit "B"**

20.4  Upon termination of this AGREEMENT:

(a)  if termination is the result of a default by GOULD, TRI may elect in writing to require GOULD to reassign the HFV PATENTS and the HFV TECHNOLOGY to TRI whereupon GOULD shall promptly reassign said HFV PATENTS and HFV TECHNOLOGY to TRI; provided, however, that should GOULD reassign the HFV PATENTS and the HFV TECHNOLOGY to TRI, GOULD will be permitted to sell or rent all EQUIPMENT which is then in the form of finished goods or work in process;

(b)  if termination is the result of a default by TRI of such a nature that TRI is unable to continue in business in any viable form or to perform its obligations hereunder, GOULD may elect in writing (i) to reassign the HFV PATENTS and the HFV TECHNOLOGY to TRI or its successor whereupon GOULD shall promptly reassign said HFV PATENTS and HFV TECHNOLOGY to TRI or its successor and TRI or its successor shall promptly refund to GOULD the total amount previously paid by GOULD to TRI in installment payments and royalty fees in accordance with Paragraph 3.1 above, or (ii) to retain ownership of the HFV PATENTS and the HFV TECHNOLOGY; provided, however, that should GOULD elect to retain ownership of the HFV PATENTS and the HFV TECHNOLOGY, should the total amount previously paid by GOULD to TRI in installment payments and royalty fees in accordance with Paragraph 3.1 above be less than Five Hundred Thousand Dollars ($500,000.00), GOULD agrees to pay TRI or its successor the difference between Five Hundred Thousand Dollars ($500,000.00) and said previously paid amount;

-24-

Exhibit "B"

C-2515

(c)  Except as specified in subparagraphs (a) and (b)
above and as may be reasonably necessary to minimize the
damages of the other party, neither party shall have any
further obligation to perform any duties hereunder;
provided, however, the obligations specified in Article VI
above relating to confidentiality shall survive any
termination of this AGREEMENT for a period of three (3)
years;

(d)  the rights of termination specified in
Paragraphs 20.2 and 20.3 above and the rights and
obligations specified in subparagraphs (a), (b) and (c) of
this Paragraph 20.4 are in addition to and not in lieu of
any and all legal remedies available to either party.


## XXI.  MISCELLANEOUS PROVISIONS


21.1  _Assignment_.  Neither this AGREEMENT nor any interest
herein may be assigned, in whole or in part, by either party
without the prior written consent of the other party, except
that, without securing such prior consent, GOULD may assign this
AGREEMENT to any purchaser of substantially all of the business
of GOULD to which the subject matter hereof relates, provided
such purchaser assumes in writing all obligations of GOULD
herein.


-25-                     Exhibit "B"

C-2515

21.2 <u>Binding Effect</u>. This AGREEMENT shall be binding upon and inure to the benefit of the parties and their respective successors and assigns.

21.3 <u>Consent</u>. Whenever consent or approval of either party is required to permit the other party to proceed in any activity permitted under this AGREEMENT, such consent shall not be withheld or delayed unreasonably.

21.4 <u>Construction</u>. This AGRELMENT shall be deemed to be made and entered into pursuant to the laws of the United States and the State of Illinois and shall be interpreted and construed in accordance with the laws of the State of Illinois.

21.5 <u>Publicity</u>. Except as may be required by applicable laws and regulations or a court of competent jurisdiction, or as required to meet credit and financing arrangements, or as required or appropriate in the reasonable judgment of either party to satisfy the disclosure requirements of any applicable securities law or regulation or any applicable accounting standard, neither party shall make any public release respecting this AGREEMENT and the terms hereof without the prior consent of the other party.

21.6 <u>Notice</u>. All notices, statements and reports required or permitted by this AGREEMENT shall be in writing and deemed to have been effectively given and received five (5) days after the date of dispatch by certified or registered mail, postage prepaid, to the party to whom any such notice, statement or report is to be given, addressed as follows:

-26-                    **Exhibit "B"**

C-2515

For GOULD:   Gould Inc.
       10 Gould Center
       Rolling Meadows, Illinois  60008
       Attention:  Corporate Secretary

       Gould Inc.
       Cardiopulmonary Products Division
       805 Liberty Lane
       Dayton., Ohio  45449-2158
       Attention:  General Manager

For TRI:    Texas Research Inc.
       8603 Botts Lane
       San Antonio, Texas  78217
       Attention:  Chief Executive Officer

Either party may change its address for the purpose of this paragraph by notice given pursuant to this paragraph.

  21.7  _Force Majeure_.  Neither party shall be in default hereunder for any failure of or delays in performance resulting from causes beyond its control, such as acts of God or the public enemy; accidents; fire; explosion; acts of war including insurrection, revolution, riot or embargo; rights of third persons (other than those conferred or permitted to arise in contravention of the obligations of this AGREEMENT) established in actions at law or in equity, including injunctions, restraining orders and stays of all kinds; and statutory and governmental prohibitions, restrictions and/or regulations; provided that, if any such cause exists for a period of six (6) consecutive months, the parties shall confer to determine whether and on what terms and conditions to continue or terminate this AGREEMENT.

  21.8  _Arbitration_.  The parties agree to use their best efforts to amicably resolve any dispute or disagreement which

-27-

**Exhibit "B"**

C-2515

arises with regard to this AGREEMENT. In the event any dispute or disagreement arises which cannot be resolved amicably, then such dispute or disagreement shall be settled by arbitration conducted in Chicago, Illinois, in accordance with the Rules of the American Arbitration Association. Judgment upon the award rendered by the arbitrator(s) may be entered in any court of competent jurisdiction.

21.9  Severability. The provisions of this AGREEMENT are severable, and in the event any provision hereof is determined to be invalid or unenforceable, such invalidity or unenforceability shall not in any way affect the validity or enforceability of the remaining provisions hereof.

21.10  Headings. The headings of the several articles are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this AGREEMENT.

21.11  Waiver. The waiver of a default hereunder by one party may be effected only by a written acknowledgment signed by the other party and shall not constitute a waiver of any other default. The failure of either party to enforce any right or remedy for any one default shall not be deemed a waiver of said right or remedy if the other party persists in such default or commits any other default, nor shall such failure in any way affect the validity of this AGREEMENT or any part hereof.

-28-                                        Exhibit "B"

C-2515

21.12  Independent Parties.  Nothing in this AGREEMENT shall be deemed to constitute, create, give effect to or otherwise recognize a partnership, joint venture or formal business entity of any kind; and the rights and obligations of the parties shall be limited to those expressly set forth herein.

21.13  Indemnity.  (a) While visiting the premises of the other party, the employees of each party shall obey all pertinent rules and regulations of the other party, including those relating to safety, to restricted areas and to safeguarding of confidential information. The parties shall indemnify and save harmless one another from and against all claims for bodily injuries, including death, or damage to property caused by a negligent act or omission of the parties or their employees in connection with such visits.

(b)  GOULD agrees to indemnify and save harmless TRI from all claims for bodily injuries, including death, or damage to property resulting from the use or operation of any apparatus or system manufactured or sold by GOULD but only in respect to apparatus and systems in which TRI had no participation in the manufacture or sale thereof.

21.14  Consequential Damages.  In no event will either party be liable for consequential damages with respect to this AGREEMENT or any portion hereof even if advised of the possibility of such damage.

-29-

**Exhibit "B"**

C-2515

21.15 <u>Entire Understanding</u>. This written instrument constitutes the entire understanding and agreement between the parties with respect to the subject matter hereof, integrates all prior understandings and agreements with respect thereto, and shall not be varied, amended or supplemented except in writing of even or subsequent date, executed by the parties.

IN WITNESS WHEREOF, the parties hereto have executed this AGREEMENT as of the day and year first above written.

GOULD INC.

ATTEST:

By _____
Robert J. Aulin
Group Vice President -
Medical Products

TEXAS RESEARCH INC.

ATTEST:

By _____
Robert L. Jensen
Chief Executive Officer

**Exhibit "B"**

-30-

C-2515

EXHIBIT A

Pending Patent Applications on HIGH FREQUENCY VENTILATOR

Australian Application Serial No. 31348/84

Canadian Application Serial No. 460,044

European Application Serial No. 843052259

Japanese Application Serial No. 162764/84

United States Application Serial No. 519,387

United States Application Serial No. 641,406

-31-

Exhibit "B"

# EXHIBIT C

SENT BY:KINKO'S-NACOGDOCHES RD; 6- 8-95 ; 1:00PM ;                                2149646666;# 5/10



May 18, 1995

Mr. Carl Strating
Tres Tech
3527 Granby Court
San Antonio, Texas  78217

Dear Carl:

It was certainly a pleasure meeting with you in San Antonio.

I have enclosed a copy of a new proposed contract between SensorMedics Critical Care and Tres Tech.  I will attempt to recap our conversation concerning the rationale for this agreement.

SensorMedics Critical Care Corporation was formed in late December 1994.  The purpose for dividing SensorMedics into two companies centered on the differences in markets for the ventilator versus diagnostic products as well as the investment market perception of an equipment business versus a service business focusing on the reduction of morbidity and cost for specific disease management.  SensorMedics Critical Care's (SMCCC) charter is to build a profitable equipment business and use those profits to develop this service oriented business.  We have decided to fund any expansion of applications on the 3100A with any extra profit that can be generated by the equipment business.

The goals of a new contract are two fold.  First, we would like to simplify the accounting requirements to administer the contract due to our limited accounting staff.  Second, we would like to fix the royalty payout at a level which maximizes our ability to add new applications in the near future which in turn would enhance both of our long term returns.

The current version of ventilator (3100A) is approved for sale in neonates and pending FDA approval in pediatrics.  In the U.S. there are approximately 670 Level III NICU's that are potential customers as well as 300 PICU's after the pediatric approval is obtained.  We are rapidly penetrating these markets.  We currently have instruments installed in half of these accounts.  Our target is to penetrate another 25% of the market in the next two years after which unit sales will begin to decline.  Also, as more units are sold the need for rentals will begin to diminish.  In addition to market penetration, surfactant therapy and maternal steroids have had a major impact on the need for ventilatory support for these infants.

In the international market, SensorMedics is our sole customer.  Our sales price is $12,500 to SensorMedics who then distributes the product directly or through other distributors.  Our current international market penetration is similar to where we were domestically two years ago.

SensorMedics Critical Care Corporation, 22705 Savi Ranch Parkway, Yorba Linda, CA 92687
(714) 283-1600    Fax (714) 283-8493

SENT BY:KINKO'S-NACOGDOCHES  RD: 6- 8-95 ; 1:01PM ;                    2149646666;# 6/10

Mr. Carl Strating
May 18, 1995
Page Two

In the short run these factors will all have a downward impact on your royalty revenue. That's the bad news. The good news is there are multiple market applications that we are exploring which potentially dwarf the total market we are currently serving. They are:

1. **MGT (Muco-ciliary Transport)**

This application potentially could take us into the home-care market. The basic principle for this application is to spontaneously breathe against the oscillatory driver. This driver is set to have a large expiratory time and a short inspiratory time which can promote the movement of secretions in the lung. The patient population this could serve is very large. To be successful however, this product needs to be sold for under $10,000/unit. Engineering to reduce the cost of the driver power supply and mechanics needs to be completed to allow this application to be implemented.

2. **Adult Application**

We had one institution present an abstract at the latest high frequency conference showing excellent results using the 3100 (with some modifications) in patients with ARDS. The mortality of ARDS is very high (greater than 60%). There are approximately 3000 U.S. hospitals that would potentially have multiple units if this application were proven and approved by the FDA.

3. **Nitric Oxide/Surfactant/Drug Delivery**

Investigation is currently proceeding on the use of Nitric Oxide in neonates as well as adults. This gas is a vasodilator in the lung and would potentially improve the ability to oxygenate diseased lungs. Two institutions, U.C. Irvine and Denver Children's Hospitals, have shown when the drug is administered by the 3100 the response to the drug is much improved. These same observations have also been shown in the administration of surfactant in neonates. The basic premise of the 3100 is to have enough mean airway pressure to open up the airways to the alveoli thereby allowing drugs to reach their ultimate target. If this could be proven the 3100 could be an instrumental component in the administration of multiple drugs whose target is the alveolus.

4. **Motionless Surgery**

At the University of Texas in San Antonio, a cardiologist has developed a new heart pump that could be used in cardiac bypass surgery. He is very interested in exploring the use of the 3100 in eliminating the lung component of the heart-lung machine. We are currently scheduled to perform animal studies on June 15 and 16 in San Antonio exploring this potential. There are 600,000 coronary bypass surgeries performed per year which presents a large opportunity for the technology. In addition to cardiac surgery, Neuro-surgery could also benefit by removing the movement in the brain caused by pressure waves transmitted to the arterial blood supply by lung excursion.

We are very excited about all these applications. As you can imagine, the pool and FDA approval of these applications is a time consuming, expensive process. The profit that SMOCC is able to generate above and beyond our target has been clearly allocated to these opportunities.

APP.139

Mr. Carl Strating
May 18, 1995
Page Three

This new contract does a number of things that I feel enhance your total royalty opportunity.

1. You are protected from any price erosion in that you get a fixed amount per ventilator independent of price. Our main competition sell their high frequency/conventional ventilator for $17,000 List Price while our average sales price is $23,000. We may be faced with lowering our sales price to remain competitive.

2. Any ventilator manufactured and put into the rental pool would have royalty paid up front rather than over time. We do have a proposal to sell our rental ventilators to a large financial leasing concern for $10,000/unit plus a fixed supply trail. Your royalty payment on this transaction would be equivalent to 7% of sales.

3. If the MCT application is proven, your royalty percentage would be 7% of the list price of the device.

4. We anticipate the sales price of the adult version will have to be $15-$20K due to competition from already existing technology. At $1200/system your royalty percentage would be between 6% and 8% and the sales opportunity in this market is substantially larger than the current market we serve.

5. As we discussed, on the royalties already paid, we had not deducted the transportation expense incurred in the rental program. We are currently averaging $15K/week in transportation costs. However we would let past royalty calculations stand.

Concerning the driver royalty, our manufacturing cost is now approximately $750 which is down from $1,100 on the original driver. That cost does not include the overhead costs for complying with the FDA. If you had an FDA licensed and approved facility capable of manufacturing the driver for $600 a unit, we would certainly purchase them from you.

I realize we are asking for a reduction of the current neonatal royalty. The royalties will not continue at the current level however, unless we strengthen our product line by pursuing other opportunities which will prevent a deterioration of our growth rate. I sincerely believe that we can use those savings to develop new applications and have a much bigger pay-off for you in the long run. As I mentioned, I will be in San Antonio on June 15 and 16 and would like to finish these discussions if possible. Please let me know. I have also included a variety of abstracts, articles and a letter that I hope you can use as an update to your investor on the current status of this product.

Regards,

William B. Ross
President

WBR:bmc
Enclosures